JOHN F. WOODMAN *vs.* WOODMAN C. PITMAN and others.

Penobscot. Opinion June 16, 1887.

*Waters. Ice. Rights of ice cutters on tidal rivers. Travelers on the ice. Law. Legislative and judicial functions. Negligence.*

Neither the right of traveling upon the ice of a river, affected by the tide, nor the right of taking ice therefrom, is an absolute property right in any person. Both are natural or common rights belonging to the people generally.

Though such rights are theoretically open to all — are for the equal enjoyment of all — those persons who first take possession of them are entitled to their enjoyment without interference from other persons; such rights are the subjects of qualified property by occupation.

Each right is relative or comparative, when conflicting with the exercise of the other right, to be itself exercised reasonably; and what would be a reasonable exercise of the one or the other, at any particular place, must depend largely upon the benefits which the people at large are to receive therefrom.

These and all other public rights, and the relation that shall subsist between them, may be regulated by the legislature as a trustee of the rights for the people.

In the absence of legislative regulation of conflicting public interests, such matters necessarily become the subjects of judicial interpretation; the scope

of the judicial, though less than the legislative, authority permitting courts to determine the manner in which such public privileges may be best enjoyed by the public, provided that any judicial regulation shall do no violence to existing legal principles.

The law is constantly subject to gradual growth and development, and when, in the ever changing conditions and relations of society, new questions arise, it has within itself elastic and creative force enough to adapt itself to such questions.

The general right of traveling on the ice in all parts of our public rivers, is not invested with the same degree of importance as that which attaches to the right of passage for vessels in navigable waters; is a less dominant right; and is the superior right or not, according to circumstances of place and situation.

The right of passage over the ice for general travel is not the paramount right at such a place as the Penobscot river at Bangor, and for some distance below, where the great body of the ice is annually taken from the river, for the purposes of trade, both domestic and foreign, constituting an enterprise of vast value to the public at large, and the traveler is there provided with a passage over roads on the banks of the river, and at ferries across the river, at the public expense; the traveler's privilege at such place being of trifling consequence, compared with other interests conflicting with it, and beset with difficulty and danger during the ice cutting season.

Those who appropriate to their use portions of a public river for ice fields, should guard their occupations, after they have been cut into, so as not to expose to danger any persons who may be likely innocently to intrude upon the fields.

Although a defendant may have been in fault in leaving an ice field unprotected against accident, a plaintiff who afterwards got injured at such place, cannot recover, if he had a clear opportunity of avoiding the accident, notwithstanding the negligence of his opponent. In a legal sense, the plaintiff's negligence is the controlling cause of the accident, and the defendant's act does not even contribute to it.

On exceptions and motion to set aside the verdict, and for new trial.

An action of the case for damages sustained by the loss of the plaintiff's two-horse team, while being driven by his driver across the ice field of the defendants, on the Penobscot river, near Bangor. The team was driven upon a place where the thick ice had been cut and removed by the defendants and the new ice had not attained sufficient thickness and strength to sustain such a weight.

The verdict was for the plaintiff for the sum of six hundred and twenty-one dollars.

The opinion states other facts.

*Charles P. Stetson*, for plaintiff.

The instructions as to right of plaintiff to travel on the ice, and the duty of the defendant in cutting ice to guard the place cut with suitable barriers to warn the traveler, were correct. *French* v. *Camp*, 18 Maine, 433; *State* v. *Wilson*, 42 Maine, 25; Angell on Watercourses, § 538.

"The rights of the riparian proprietor were not changed in the least, when the surface of the river was covered with ice, all the citizens had still a right to traverse the river in that state at pleasure." 42 Maine, 25.

*Wilson and Woodard*, for defendants.

PETERS, C. J. This case largely depends for its solution upon what may be the extent of the right to harvest ice from our large rivers, compared with the conflicting right of traveling upon such rivers during the winter season. This is an interesting topic of inquiry, in view of the importance which ice has lately assumed as a merchantable commodity, and is a branch upon which the law has as yet hardly passed beyond a formative period. The inexhaustible and ever-changing complications in human affairs are constantly presenting new questions and new conditions which the law must provide for as they arise; and the law has expansive and adaptive force enough to respond to the demands thus made of it; not by subverting, but by forming new combinations and making new applications out of, its already established principles,—the result produced being only "the new corn that cometh out of the old fields."

Neither of the rights which seem in conflict in the present case, that of harvesting ice and that of traveling upon the ice, is absolute in any person. No one has any absolute property in either. They are derived from a natural right which all have, to enjoy the benefit of the elements, such as air, light and water, and are common or public rights which belong to the whole community. In the Roman law they were classified as "imperfect rights." Not that all persons can or do enjoy the boon alike. Much depends upon first appropriation. One man's possession may exclude others from it. Says Blackstone (2 Com. 14):

" These things, so long as they remain in possession, every man has a right to enjoy without disturbance ; but if once they escape from his custody, or he voluntarily abandons the use of them, they return to the common stock, and any man else has an equal right to seize and enjoy them afterwards." They are the subjects of qualified property by occupation.    2 Kent's Com. 348.

Each right is in theory, speaking generally, relative or comparative. Each recognizes other rights that may come in its way. Each must be exercised reasonably. And what would be a reasonable exercise of the one or the other at any particular place, for, clearly, there would be a difference in the relative importance of the different rights in different localities, depends in a large degree upon the benefits which the community derive therefrom. The public wants and necessities are to be considered. The two kinds of franchise belong to the people at large, are owned in common, and the common good of all must have a decisive weight on the question of individual enjoyment.

These, and all other public rights, and the relation that shall subsist between them, when not thereby trenching upon congressional jurisdiction, may be regulated by the legislature. The legislature is the trustee of the public rights for the people. And, as such agent or trustee, the legislature of this state has gone a great way in abridging an individual enjoyment of some of the common rights and privileges possessed by society, when the legislation has presumably inured to the common good. It authorized the changing of the channel of Saco river, although the effect of the diversion was to impair the value of a good deal of private property. *Spring* v. *Russell*, 7 Maine, 273. Has allowed private interests to be subserved to the injury of other private interests, by permitting dams and mills to be erected which prevented the flow and ebb of the tide, upon the ground that the public, as a whole, were to be benefitted thereby. *Parker* v. *Cutler Milldam Co.* 20 Maine, 353. Has granted to a single individual the exclusive right of navigating Penobscot river above the tide with steamers for a period of twenty years, for the consideration of improvements to be made in the navigation of the river by the grantee. *Moor* v. *Veazie*, 31 Maine,

360; S. C. 32 Maine, 343; S. C. 14 How. 568. These are illustrations of the legislative power in such matters.

The legislature has the constitutional authority, no doubt, to provide rules regulating the possession and cultivation of the ice fields upon our navigable rivers, where the tide ebbs and flows, at all events so far as the business is carried on below low water line; and for the adjustment of conflicting interests which may affect that privilege. If it omits to do so, such matters necessarily become the subjects of judicial interpretation. While the judicial is not co-extensive with the legislative jurisdiction upon the questions, there can be no doubt that it is within the scope of judicial authority to determine the manner in which such public privileges may be best enjoyed by the public, provided that any judicial regulation which may be attempted shall do no violence to existing law.

The law is subject to slow and gradual growth. A remarkable instance of the development of the law is seen in the doctrine unanimously adopted by the courts in this country, that a river may be considered navigable, although not affected by a flow of the tides from the sea. The common law was otherwise. Lord HALE, the great publicist, knew no such doctrine. Legislation did not create it. The courts felt obliged to adopt the interpretation, as a new application of an old rule, from an irresistible public necessity. The court of no state has probably ventured so far as this court has, in maintaining that small streams have floatable properties belonging to the public use. Our climate and forests, together with the interests and wants of the community, make the doctrine here reasonable — a reasonable interpretation of the law. While in some of the states, where less necessity for the doctrine exists, it is considered by their courts to be untenable as subversive of private rights. So, in handling the somewhat novel and important questions now pending before us, we are certainly at liberty to construct out of admitted legal principles, such reasonable rules as will meet the requirements of the case.

The importance to the public, of the ice privileges within the territory before named, is incomparably greater than is that of

traveling on the ice. Winter river-roads are of much less consequence at the present day than formerly. In the earlier days, the natural ways were the only ways for travel, and upon the large ponds and lakes and upon the rivers in remote places, the same necessity may even now exist. But at Bangor, and for some distance below, the principal area of Penobscot river from which the ice cuttings have been for some years customarily taken, the public have no need of a way on the ice. The traveler receives much more than an equivalent for any deprivation of the natural passage, in the use of the roads on the banks of the river, at all times kept passable at the public expense. Roads over the ice are rarely suitable and passable — only occasionally so. The access to them from the shores is difficult if not dangerous, where the tide, as it does here, ebbs and flows. Permission must be had of the riparian proprietor to cross his land, to enable one to get to the river without being a trespasser. The inconveniences render the privilege nearly, if not quite, worthless. Nor is any considerable use of the river for such purpose proved or suggested.

On the other hand, the business of gathering ice for merchantable purposes has assumed extraordinary importance on our rivers. Large amounts of capital are invested; thousands of men and of teams are employed at a season of the year when other employment cannot be obtained by them; the outlay is mostly in bills for labor, widely circulated; a crop of immense value is annually produced from an exhaustless soil without sowing; the shipping business is materially aided by it; the wealth of the state is greatly increased by it; it is eminently a business of the people. It would seem unreasonable to embarrass such an important enterprise by according to the traveling public a paramount right of passage, when such right, even to its possessor, is scarcely good for anything.

It is an error, we think, to invest the right of passing on the ice in all places with the same degree of importance as that which attaches to the right of vessels in navigable waters. It may be an offshoot of the navigable right — something akin to it — but a right of a secondary or inferior degree. The idea of roads

over the frozen surface of rivers was never broached in the old
common law — it has grown up since — and should be the
superior right or not, according to circumstances.  We know of
only one judicial decision touching the subject, that in our own
state (*French* v. *Camp*, 18 Maine, 433), and that does not
contradict the views we express in this discussion.  There the
plaintiff's injury came from the defendant's carelessness in cutting
a hole through the ice, and leaving it exposed, upon or near a
place where there had been a winter road for more than twenty
years.  WESTON, C. J., there says : "Assuming that the defend-
ant has as good a right to the use of the water, as the plaintiff
or the public generally had to the right of passage, the use of a
common privilege should be such as may be most beneficial and
least injurious to all who have occasion to avail themselves of it."
In the present case, it must be remembered, the defendants are
not defending themselves as riparian owners, for that would
justify their possession only to low water line, but as a portion
of the public, partaking of a common and public right.  *Brastow*
v. *Rockport Ice Co.* 77 Maine, 100.

An unlawful obstruction to navigation, being a common
nuisance, is remedial by indictment, or by abatement ; or a court
of equity may take jurisdiction upon an information filed by an
attorney general.   Gould, Waters, § 121.   It would seem
strange to see the ice harvesters accused of nuisance.   But
nuisance exists, in lawful business, only where actual injury is
sustained.  It must be some essential injury and damage.  "People
living in cities and large towns must submit to some annoyance,
to some inconvenience, to some injury and damage ; must even
yield a portion of their rights to the necessities of business."
Wood, Nuisance, 11.   In an English case it was said : "Where
great works are carried on, which are the means of developing
the national wealth, persons must not stand on extreme rights,
and bring actions for every petty annoyance."  *St. Helen's Smelt-
ing Co.* v. *Tipping*, 11 Jur. 785, reported in 116, E. C. L. 1093.
In *Rhoades* v. *Otis*, 33 Ala. 538, a much quoted case, the test
of the floatability of a stream was held to be, whether fit for
valuable floatage and useful to important public interests.   In

*Wethersfield* v. *Humphrey*, 20 Conn. 217, it was held that, in order to make a stream navigable, "there must be some commerce and navigation upon it which is essentially valuable." Same decision in 22 Conn. 198. Navigators must endure inconveniences for the greater general good. *Brown* v. *Town* of Preston, 38 Conn. 219. To constitute nuisance, the obstructions must *materially* interrupt general navigation. *State* v. *Wilson,* 42 Maine, 9. In *Rowe* v. *Granite Bridge Co*. 21 Pick. 344, 347, SHAW, C. J., said; "But in order to have this character it must be navigable to some purpose useful to trade or agriculture." In *Attorney General* v. *Woods*, 108 Mass. 436, it is said that this language is applied to the capacity of the stream rather than to its uses. But the last was a case where the officers of the Commonwealth were endeavoring to prevent an act supposed to injuriously affect the harbor of Boston.

It is our opinion, that any occupation of the Penobscot river, within the limits now receiving our attention, for the purpose of a winter way would be, at this day, of such insignificant importance, so useless and valueless in comparison with other public interests, that it cannot be set up to prevent or abridge the taking of ice within those limits to any extent whatever.

We do not, however, apply the rule stated to any place where a way is commonly used across the river, connecting town or county roads, or where a ferry is established by law. R. S., c. 20 § 7.

The traveler's right, even if existing theoretically, does not, under the circumstances, assert itself. Reasonable use is practically no use. The same public possessing both rights prefer to abandon the use of the one for the much more valuable use of the other.

We are aware that the law, in facilitating the enjoyment of public rights,— and no private right is involved in this controversy,— scans closely the grounds upon which it admits the advantage of one person to be set off against the disadvantage of another. In an early English case, *Rex* v. *Russell*, 6 B. & C. 566, an extreme rule was promulgated, in later cases not fully assented to, that staiths erected in the river Tyne, should not be

regarded as a public nuisance, if the public benefit produced by them countervailed the prejudice done to individuals,— the supposed public benefit being that in consequence of the erections coals would be brought to the London market in better condition or for lesser price. In subsequent cases it has been maintained that the benefit to be derived from tolerating any impairment of the navigable convenience, must be direct, and that the staiths in the Tyne, were a remote and indirect benefit merely, and not computable as a public benefit in the sense of the term in which it should be used when considering the question of nuisance; and it has been explained that the benefit must be a public benefit to the same public; that the same public or same part of the public which suffers the inconvenience, must also receive the benefit; that it must be both beneficial and injurious to the public using the same waters.

A satisfactory explanation of the doctrine appears in a discussion by HESSEL, M. R., in *Attorney General* v. *Terry*, L. R. 9 Ch. 423, where he says; "Then it may be asked, what is a public benefit? In my view it is a benefit of a similar nature, showing that on a balance of convenience and inconvenience the public *at that place* not only lose nothing, but gain something by the erection." In that case it was decided that any benefit in the way of gaining trade, to a single individual erecting a wharf in navigable waters, was too remote to be held to be for the advantage of the public generally, when the channel intruded upon was so narrow that every foot of it was wanted for navigation. In the opinion an illustration of public benefit is given, by supposing the piers of a bridge to be placed in the middle of a navigable river, thereby "to some extent, to a more or less material extent, obstructing the navigation," but the necessity is great and the injury trifling. In that case, says the opinion, "it would be a benefit that would counterbalance the public injury."

Applying the doctrine as carefully as it is guarded in the cases most widely differing from the case of *Rex* v. *Russell*, above cited, we feel assured that our conclusions are correct in sustaining the contention of the present defendants. Here the ice-

gatherer and the traveler belong to the same public; have presumably interests alike; were using the same river — the same waters — though in different ways. The ice-takers were occupying the river under the natural right of dipping water therefrom, and it is as if thousands of men were simultaneously exercising the right together  The enterprise directly fosters the interests of navigation on the river.  On the other hand, as we have before said, the right of the traveler, so far as pertaining to the navigation of the river, is, under the circumstances, at most a secondary, theoretical right and of no real and essential value.  Even private property may be taken for public use by affording compensation.  Here, if the traveler is not allowed the use of the river, it is because more than compensation is supplied to him in other roads provided for his use.

We think the trial was conducted upon a too literal application of the principles which govern the use of navigable streams, and that the jury were thereby prejudiced against the defendants' to their injury.

These views being accepted, it necessarily follows that this portion of the river should be considered as virtually closed during the winter against general traveling.   The whole tract cut over must be constantly beset with danger to a traveler who does not keep up an especial acquaintance with the condition of the ice.   Besides, the ice fields, after they have been staked and fenced and scraped, and in some instances connecting fields extend across the river, have so far become the property of the appropriator that an action would lie against one who disturbs his possession. *People's Ice Co.* v. *Steamer Excelsior*, 44 Mich. 229.

At the same time the appropriators should by suitable means reasonably guard their fields against exposing to danger persons who may be likely to innocently intrude upon them, if such likelihood may be seen to exist.  It is not necessary, in the present case, to inquire whether the defendants sufficiently observed such caution or not, inasmuch as we are clearly of the belief that the plaintiff's servant in charge of his team, was guilty of an act of carelessness which caused the plaintiff's loss.

Even if the defendants were in fault, their delinquency would be a prior act, while the servant's was a subsequent, distinct, independent act. The defendants had no reason to suppose the servant would go in the direction he did, or be heedless in his course if he were to go there. As some judge said : "One man is not required to take another man's discretion in his keeping."

At all events, the defendants' act or omission was not negligence against the plaintiff—not an act which the plaintiff can complain of. The idea is clearly expressed in 2 Law Quar. Rev. (London) p. 507 : "The party who last has a clear opportunity of avoiding the accident, notwithstanding the negligence of his opponent, is considered solely responsible for it." In such case defendants are not even guilty of contributory negligence ; that is, their negligence does not in a legal sense contribute to it or participate in it. It is merely a passive agency, or condition, or situation, through or by which the accident happened — but no part of its real and controlling cause. *O'Brien* v. *McGlinchy*, 68 Maine, 552, 557.

The servant was hardly even a traveler on the river in the ordinary sense of the term. He was himself an operative at the ice fields. He came with his team upon the ice by crossing defendants' land, striking a traveled way which led upon the ice, along the shore, up to the field of operations he was to engage in. From a freak of his own, instead of keeping the road, as properly he should, he crossed one of defendants' fields, as properly he should not, and while attempting to go across or around another field of theirs, his team broke through the ice and was lost.

The pretense is set up that the defendants had no fence as a protective barrier at the end of the field extremest from the west bank of the river, to prevent the traveler from going upon the thin ice. None was needed. The exercise of ordinary care by the servant was all that was needed. There was a large ridge of snow and ice at the easterly end of the field, several feet high, thrown up by scraping the field from west to east in preparation for ice-cutting. It seems that the ice was left uncut and solid for a space of twelve or fifteen feet in width inside of the piles

or ridge, in order to afford space wide enough for a pair of horses to travel upon while cutting out and handling the cakes of ice. It is a risky track for any horses, but what dangers there are upon the track is incidental to the business. The servant confesses that he was acquainted with the mode of the business,— that he knew that the ice had been scraped up to the ridge of snow,— knew that there might be holes and thin ice where the field had been scraped,— knew that he was going upon the scraped ice,— and still he recklessly undertook to conduct his team on the inside of the ridge, when there was an abundance of room to drive safely outside of it. By his carelessness, for which there seems to be no rational explanation, the plaintiff's property was lost.

*Motion sustained.*

WALTON, DANFORTH, VIRGIN, LIBBEY and FOSTER, JJ., concurred.

HASKELL, J. I concur in the result, but I cannot agree to the reasoning of the opinion of the court for the following reasons:

The right of navigation in public waters is paramount, although they may be subjected to any other useful purpose, even though such use may temporarily impede the paramount right; but when a use blocks navigation, it must cease until the necessities of navigation be served.

A vessel may lawfully be at anchor in and completely obstruct a roadstead so long as it is not needed for passage by other vessels; but when needed, the channel must be left open. The rights of passage and of anchorage are common rights, but the former from necessity is paramount, that both rights may be reasonably enjoyed. Both may be exercised, but neither can lawfully be destroyed.

A sailing vessel in ascending a river may occupy the whole channel if necessary, and a steamer astern must so remain unless it may pass her safely; but when the former comes to anchor, the steamer has the paramount right of passage, and the channel must be left open if possible.

So a traveler upon a highway has the paramount right to pass along, and teams standing and obstructing the way must move to give reasonable chance for passage.

Frozen navigable rivers are public highways, and the traveler ordinarily has the paramount right of passage as necessarily incident to the reasonable enjoyment of his right, but it must be exercised in common with such uses as the frozen surface of the river is adapted to. One such use is the harvesting of ice, a use that may impede travel. Both are common rights, and both may be lawfully exercised; but both cannot be enjoyed at the same spot at the same time, because the one may be there destructive of the other, so that it may be reasonable for that use giving the larger public benefit to restrict other uses to a narrower compass, but it cannot lawfully monopolize the whole right to the utter destruction of all other rights.

Ice gathering has become a remunerative and useful industry, and is of great benefit to the public. The nature of the business necessarily requires that it should not be subjected to a paramount right of travel that may destroy its reasonable enjoyment. Both ice gatherers and travelers are partakers in a common right. Neither has such a paramount right as to permanently and entirely extinguish that of the other; but both may exercise their right reasonably under all the circumstances surrounding their conduct.

If the public has appropriated a particular portion of the ice of a stream or pond, and has worn a well beaten track upon the same, would it be reasonable for the ice gatherer to interrupt such use? So if the ice gatherer has appropriated and marked his ice fields, leaving the traveler room for passage, would it be reasonable for the traveler to go upon it and defile it? Both uses of the ice are lawful, but neither may wholly exclude the other. Both cannot have the possession and use of the same ice for different purposes, although both have a common right to it so long as it remains unappropriated by either. The taker of water from a stream may not interfere with the navigation of it; but the harvester of ice obstructs the public highway at that place, so the one can no more take the whole ice and destroy the public highway, than the other without legislative authority could

divert the stream and leave its bed dry and unnavigable. Courts may declare the relative rights of persons, but they cannot extinguish them.

The plaintiff's servant had no need to enter upon the defendants' ice field, and he is .chargeable with notice of the dangerous character of the spot, and for his imprudence in so doing the plaintiff is not entitled to recover.