ROSSMILLER, Plaintiff in error, vs. THE STATE, Defendant
                              in error.

                    *March 14—April 1, 1902.*

*Statutes: Construction: Legislative intent: Navigable waters: Pow-
    ers of the state: Ownership of ice, etc.: Rights of the people:
    Constitutional law.*

1. The legislative intent of a law being plain, that intent must be
     considered the sole purpose of the enactment, however unrea-
     sonable or absurd the law may appear when so viewed.

2. An exposition of the meaning of a law in the law itself cannot
     be departed from by the courts.

3. The title to the beds of navigable lakes within the state of Wis-
     consin is vested in the state in trust to preserve the same for
     the enjoyment of the people. The state has no proprietary
     right in such beds or in the water above the same, nor in the
     fish that inhabit such water or the fowls that resort thereto,
     or the ice that forms thereon, which it can deal in by sale or
     otherwise.

4. The power of the state over navigable waters within its bound-
     aries is limited to the enactment and enforcement of such rea-
     sonable police regulations as may be deemed necessary to pre-
     serve the common right of all to enjoy the same for navigation
     by boats or otherwise, and all incidents of navigable waters,
     including the taking of ice therefrom for domestic use or sale.

5. The rights of the people in the navigable waters of the state are
     the same as those incident to tidal waters at common law. They
     are beyond the power of the state to interfere with, except by
     reasonable police regulations, as before indicated.

6. The state has no greater right to sell ice that forms upon navi-
     gable lakes than to sell the water thereof in a liquid state or
     the fish that inhabit the water. It can do neither, the whole
     beneficial use of public waters being in the people of the state
     as a class.

7. When the term "people of the state" is used to designate the
     beneficiaries of the trust in navigable waters, all the people
     who may choose to enjoy the same within the state are referred
     to, whether citizens of the state or persons who come within
     its territory for the purpose of enjoying such public rights.

8. A law treating some persons within the state differently than
     others, in respect to the enjoyment of public waters, violates
     the fourteenth amendment of the national constitution, guar-

antying to all persons within the jurisdiction of the state the equal protection of the laws.

9. The right to take ice from public waters within the state being a possession of all the people thereof, a law which exacts from any individual a sum of money as a consideration for the enjoyment of such waters, upon the theory that the state is the owner of the ice, violates the fourteenth amendment of the federal constitution, prohibiting any invasion of the right to liberty and property without due process of law, and violates sec. 13, art. I, of the state constitution, prohibiting the taking of private property for public use without just compensation.

[Syllabus by MARSHALL, J.]

ERROR to review a judgment of the municipal court of Racine county: WILLIAM SMIEDING, JR., Judge. *Reversed.*

Error to review the judgment convicting the plaintiff in error for violating ch. 470, Laws of 1901, which provides in brief as follows:

Sec. 1. The cutting of ice from any meandered lake of the state, for shipment out of the state, is prohibited except by those permitted to do so by a license issued by the secretary of state in the manner herein prescribed, on or before the first Monday of September immediately preceding the season for such cutting.

Sec. 2. Such license shall not be issued till the party applying therefor shall file with such secretary a bond in the sum of at least $10,000, with sufficient sureties, satisfactory to such secretary, conditioned that the applicant will comply with this act.

Sec. 3. Every such licensee shall, on or before the first Monday in November succeeding the year covered by his permit, file with such secretary a verified statement of the number of tons of ice cut and shipped out of the state thereunder during such year, and pay into the state treasury, on or before the first day of December thereafter, ten cents for each such ton.

Sec. 4. Making a false statement under the foregoing sec-

tion shall constitute the crime, of perjury, and the guilty person shall be subject to punishment accordingly.

Sec. 5. Any sum due from any licensee under this act may be collected in an action in any circuit court in the name of the state, commenced at the instance of the attorney general or any citizen thereof.

Sec. 6. The income derived from the execution of this act shall form a part of the common school fund.

Sec. 7. Any person, whether acting as principal, agent or employee, who shall cut and ship ice out of the state in violation of this act, in addition to any other penalty incurred under the foregoing provisions, shall be deemed guilty of a misdemeanor, and upon conviction shall be punished by a fine of not less than $100 nor more than $1,000, or imprisonment for not less than thirty days nor more than one year, or both such fine and imprisonment, in the discretion of the court.

Sec. 8. Any licensee under this act failing to comply with section 2 hereof shall forfeit the sum of $5,000 for each offense, and the attorney general shall enforce such forfeiture by an action upon the licensee's bond.

Sec. 9. Ice formed upon the meandered lakes of the state is the property of the state. The design of this act is to prevent such cutting and shipping except upon condition of the state being compensated for the ice to the amount of ten cents per ton.

After the passage of such act by the legislature, it received the approval of the governor upon the theory, solely, that the ice formed upon navigable lakes of the state is state property, which it may sell as a means of adding to the public revenues.

The plaintiff in error cut and shipped ice out of the state without complying with the act. He was informed against therefor as being guilty of a misdemeanor under sec. 7 thereof. Upon the trial counsel for plaintiff in error insisted that

he was not guilty of having committed any offense under the laws of this state, because the act attempting to make conduct such as he was charged with an offense is unconstitutional and void for several reasons specified. The court decided otherwise. Under such decision the evidence established the guilt of the accused. He was found guilty, and a judgment was rendered accordingly, requiring him to pay a fine of $100 and costs.

For the plaintiff in error there was a brief by *Kearney, Thompson & Myers,* and oral argument by *T. M. Kearney* and *J. L. O'Connor.* They argued that ch. 470, Laws of 1901, is void in that it is an attempt to establish an ownership in the state as proprietor of the meandered lakes lying within the state, contrary to the trust reposed in the state therein for the public purposes of navigation, fishing, and kindred public uses. *McLennan v. Prentice,* 85 Wis. 427–444; *Ill. Cent. R. Co. v. Illinois,* 146 U. S. 387; *Priewe v. Wis. State L. & I. Co.* 93 Wis. 534, 550; *Willow River Club v. Wade,* 100 Wis. 86, 113; *Att'y Gen. ex rel. Askew v. Smith,* 109 Wis. 532; *Pewaukee v. Savoy,* 103 Wis. 271, 274; *Priewe v. Wis. State L. & I. Co.* 103 Wis. 537, 549; *Brown v. Cunningham,* 82 Iowa, 516; *Ill. Steel Co. v. Bilot,* 109 Wis. 418. The taking of ice from a meandered lake is a public use, and every one is entitled to take it as of common right so long as no trespass is committed in the taking. *Cummings v. Barrett,* 64 Mass. 186; *Roxbury v. Stoddard,* 89 Mass. 158; *Gage v. Steinkraus,* 131 Mass. 222; *Hittinger v. Eames,* 121 Mass. 539; *People's Ice Co. v. Davenport,* 149 Mass. 324; *Brastow v. Rockport Ice Co.* 77 Me. 100; *McFadden v. Haynes Ice Co.* 86 Me. 319; *Woodman v. Pitman,* 79 Me. 456. The act is an attempt to take for public use, without making just compensation, the property right of the owners of lands abutting on meandered lakes to take ice therefrom, and is in violation of sec. 13, art. I, Const. *Delaplaine v. C. & N. W. R. Co.* 42 Wis. 214; *Boorman v.*

*Sunnuchs,* 42 Wis. 233; *Diedrich v. N. W. U. R. Co.* 42
Wis. 248; *Cohn v. Wausau Boom Co.* 47 Wis. 322; *Janes-
ville v. Carpenter,* 77 Wis. 300; *Priewe v. Wis. State L. &
I. Co.* 93 Wis. 534. The act violates sec. 1, art. VIII, Const.,
prescribing uniformity in the rule of taxation, in that it at-
tempts to impose a tax by way of discrimination upon ice
shipped out of the state. In levying a license fee, charge, or
duty upon any article of trade or commerce shipped out of
the state, the state is attempting the exercise of a branch of
its taxing power. *Gibbons v. Ogden,* 9 Wheat. 188-201;
Lewis, Federal Power over Commerce, 91; *Robbins v. Shelby
Co. Tax Dist.* 120 U. S. 489. For the purpose of general
taxation ice stored is clearly personal property and as such
subject to assessment. Stats. 1898, sec. 1036; *Winkley v.
Newton* (N. H.) 35 L. R. A. 756. The act in question sub-
jects ice shipped outside of the state to double taxation, and
for that reason is invalid. The act violates the third subdi-
vision of sec. 8, art. I, Const. of U. S., in that it is an attempt
on the part of the state to regulate commerce among the sev-
eral states. *Gibbons v. Ogden,* 9 Wheat. 188; *Mobile Co. v.
Kimball,* 102 U. S. 702; *Fuller v. C. & N. W. R. Co.* 31
Iowa, 187; *Council Bluffs v. K. C., St. J. & C. B. R. Co.* 45
Iowa, 338; *Crow v. State,* 14 Mo. 237; *Indiana v. Pullman
P. C. Co.* 16 Fed. 192; *Kaeiser v. I. C. R. Co.* 18 Fed. 151;
*Fry v. State,* 63 Ind. 562; *Carton v. I. C. R. Co.* 59 Iowa,
148; *Bennett v. Am. Exp. Co.* 83 Me. 236; *St. Clair Co. v.
Interstate Trans. Co.* 109 Fed. 741. The power vested in
Congress to regulate interstate commerce is exclusive. *Gib-
bons v. Ogden,* 9 Wheat. 188, 209; *In re State Freight Tax,*
15 Wall. 236; *Mobile Co. v. Kimball,* 102 U. S. 691; *Kaeiser
v. I. C. R. Co.* 18 Fed. 151; *Gatton v. C., R. I. & P. R. Co.*
95 Iowa, 112; *Hardy v. A., T. & S. F. R. Co.* 32 Kan. 698;
*Foster v. Blue Earth Co.* 7 Minn. 140; *Thoms v. Green-
wood,* 6 Ohio Dec. (Reprint) 639, 7 Am. L. Rec. after
p. 768. The act violates the fifth sudivision of sec. 9, art. I,

and the second subdivision of·sec. 10, art. I, Const. of U. S.,
in that it attempts to lay a tax, impost, or duty in no manner
necessary to or connected with any inspection law of the
state, upon exports therefrom, without the consent of Con-
gress.   Any attempt on the part of a state legislature to im-
pose a license fee, tax, or charge upon a commercial com-
modity or upon the owner thereof as a condition to the right
to ship such commodity into another state, is an interference
with interstate commerce, within the constitutional provisions
contained in said sections.  *Reading R. Co. v. Penn.* 15 Wall.
280 ; *Almy v. California,* 24 How. 169 ; *State ex rel. Cor-
win v. Indiana & Ohio O., G. & M. Co.* 120 Ind. 575 ;
*Jamieson v. Indiana N. G. & O. Co.* 128 Ind. 555 ; *Carson
River L. Co. v. Patterson,* 33 Cal. 340 ; *Blount v. Munroe,*
60 Ga. 64, 66 ; *Low v. Austin,* 13 Wall. 34 ; *Pickard v. Pull-
man S. C. Co.* 117 U. S. 34 ; *St. Louis v. W. U. Tel. Co.* 39
Fed. 60 ; *Leloup v. Mobile,* 127 U. S. 647 ; *Pullman S. C.
Co. v. Nolan,* 22 Fed. 280 ; *Jackson Mining Co. v. Auditor
General,* 32 Mich. 488 ; *State v. C. & P. R. Co.* 40 Md. 22.
It is manifest that the purpose of the law is to secure revenue
and not to protect the public through reasonable regulations
from fraud in manufactured articles, or from injury to
health through the distribution of deleterious food sub-
stances. It is, therefore, an attempted exercise of the taxing
power of the state and not of its police power, and for that
reason is in conflict with the provisions of the federal consti-
tution last cited.    State & Fed. Cont. of Per. & Prop. 482.
*Brown v. Maryland,* 12 Wheat. 419, 447 ; *McCulloch v.
Maryland,* 4 Wheat. 413 ; *Guy v. Baltimore,* 100 U. S. 434,
443 ; *Brimmer v. Rebman,* 138 U. S. 78.

For the defendant in error there was a brief by the *Attor-
ney General,* and oral argument by the *Attorney General*
and *Mr. E. N. Warner,* law examiner.  They contended that
the state has the right to entirely prohibit the exportation of
fish, game and ice.  Gould, Waters (3d ed.) sec. 189 ; *Mc-*

*Cready v. Virginia,* 94 U. S. 391; *Geer v. Connecticut,* 161 U. S. 519; *Bittenhaus v. Johnston,* 92 Wis. 588; *West Roxbury v. Stoddard,* 7 Allen, 158; *Organ v. State,* 56 Ark. 270; *Sanborn v. People's Ice Co.* (Minn.) 51 L. R. A. 829; *Ex parte Maier,* 103 Cal. 476; *State v. Rodman,* 58 Minn. 393; *Magner v. People,* 97 Ill. 320; *Hagerty v. St. Louis I. M. & S. Co.* (Mo.) 40 L. R. A. 151. If the state can forbid the transportation of ice out of the state, it may consent to the transportation of ice out of the state upon such conditions as it may see fit to impose. *Comm. v. Hilton* (Mass.) 45 L. R. A. 475. The ice upon meandered lakes is the property of the state, and the regulation with respect to the taking thereof falls within the powers of the legislature. *Sanborn v. People's Ice Co.* (Minn.) 51 L. R. A. 829; *Concord Mfg. Co. v. Robertson* (N. H.) 18 L. R. A. 679. The act in question is an exercise of the police power of the state, and the method and discretion of such exercise is reposed in the legislature. *Munn v. People,* 69 Ill. 93; *Willis v. Standard Oil Co.* 50 Minn. 290. Being an exercise of the police power, it in no wise conflicts with sec. 8, art. I, Const. *McCready v. Virginia,* 94 U. S. 391; *People v. Lowndes,* 130 N. Y. 462; *Geer v. Connecticut,* 161 U. S. 519.

MARSHALL, J. Is ch. 470, Laws of 1901, valid? That is the only question involved in this case. An affirmative answer would require an affirmance of the judgment, and a negative answer a reversal thereof and a direction to the trial court to discharge the plaintiff in error.

There is no room for controversy, either as to the intent of the lawmaking power in the enactment here called in question, or but that both the legislative and executive idea, in placing the same on the statute book, was that it dealt with a subject of vast importance to the state. There are some striking features in the act indicating that with all the certainty of a mathematical demonstration. The severe penalties and for-

feitures provided for, of themselves, clearly evidence the magnitude of the state interest which those concerned in the legislation supposed they were conserving. The act allows no one to cut ice on the meandered lakes of the state for shipment beyond its borders, regardless of the extent of his operations, without first giving a bond to the state in the sum of $10,000. A person who makes a false statement of the extent of his operations, to the secretary of state, whether wilfully or otherwise, is made guilty of the crime of perjury and subjected to punishment therefor under the criminal laws of the state which were designed to deal with that serious offense. Any citizen of the state is armed with authority to set judicial machinery in motion in any of its circuit courts, to collect any indebtedness that may accrue to it for ice taken from its meandered lakes by any licensee. A person concerned in cutting any such ice and shipping the same out of the state, contrary to such act, regardless of his part in the operations, even though it be that of a mere employee, and regardless of whether he acts with or without knowledge that no license has been obtained to authorize such operations, and of the extent of his work, is made guilty of a misdemeanor in addition to all other offenses he may be guilty of under the act, and is made subject to punishment for such independent offense by a fine of not less than $100 nor more than $1,000; or imprisonment, presumably in the county jail, of not less than thirty days; or such imprisonment, presumably in the state prison, for the full term of one year, and at hard labor we must assume, and, as in other cases of imprisonment in the state prison, with a reasonable period of solitary confinement. If any person fails to make a report to the secretary of state of the extent of his operations, regardless of the cause of such failure, or to pay the purchase price for the ice taken by him, regardless of the amount in default, he is made liable upon his bond, filed with the secretary of state, in the sum of $5,000.

Those drastic provisions cannot be made to harmonize at all with reason and common sense, except upon the theory that it was supposed a source of great wealth, for the state to draw from to meet its legitimate expenses, existed in the ice which annually forms upon its navigable waters; that such source had remained undiscovered and unenjoyed by the rightful owner so long, and the importance of laying hold thereof for its legitimate use was so great, and the right of the matter was so plain in fact, yet so misunderstood by those who had for years enjoyed the opportunity apparently open to all as of right, that it was the duty of the legislature, not only to proclaim the property right of the state, but to take thereto its own with such an indication of the strength of its position, and the heinous character of any interference with its title, as not to admit of any reasonable excuse therefor, and so as to leave no reasonable ground to expect that any person would venture to so interfere. In that view, it seems, the law in question was conceived and brought forth, giving to that which has been supposed, since the organization of the state, to be the common heritage of all, such an indelible stamp of absolute state ownership that no right-minded person would dare violate it. In that aspect the law calls for the most careful consideration—more than the ordinary care, we should say, devoted to constitutional questions. There must be some added care, constituting a fitting recognition of the unusual importance which the lawmaking power seems to have ascribed to the act.

We are not troubled, as is sometimes the case, to determine just what is the legislative idea embodied in the act. Both the legislative and executive branches of the lawmaking power, *ex industria,* made that so plain in the act itself that it would be a reflection on their efforts in that regard to go outside thereof to find reasons to support the law by viewing it from a different standpoint than its makers intended.

Courts look to the language of a law to discover the intent thereof. When that discovery is made, such language is taken as expressing only such intent, even though a different meaning might be gathered therefrom. Vattel's rule for judicial construction, so often quoted by courts, applies to this law: 'It is not allowable to interpret what has no need of interpretation. When the meaning of a law is evident, to go elsewhere in search of conjecture in order to restrict or extend the act, would be an attempt to elude it, a method which, if once admitted, would be exceedingly dangerous, for there would be no law, however definite and precise in its language, which might not by interpretation be rendered useless.' *Gilbert v. Dutruit,* 91 Wis. 661, 65 N. W. 511; *State ex rel. Heiden v. Ryan,* 99 Wis. 123, 74 N. W. 544. Of course, the error in judicial administration, that rule is designed to guard against, which would make a good law bad or useless by interpretation, would make a void enactment good by the same means. There is a further feature of Vattel's rule, expressed thus: 'Where the meaning is evident and leads to no absurd conclusion, there can be no reason for refusing to admit the meaning which the words naturally represent.' It is fundamental that if, giving to the words of an act their literal or natural meaning, the conclusion reached would be unreasonable or absurd, some other meaning within the reasonable scope of the words may be adopted to avoid that result, if it appears that such other meaning may probably have been the one intended. *Harrington v. Smith,* 28 Wis. 43; *Mason v. Ashland,* 98 Wis. 540, 545, 74 N. W. 357; *Wisconsin Industrial School for Girls v. Clark Co.* 103 Wis. 651, 79 N. W. 422. However, where the apparently absurd meaning is unquestionably the real one, the law must stand with such meaning or fall altogether. So it will be seen that the primary purpose of the law must be kept in view in determining whether it is valid or not. It is the legislative will that must stand the test in determining whether the act is good or bad.

Looking to the language of the law here, that will seems unmistakable. If the consequences, looking at the law from that standpoint, appear fatal, we are precluded from searching for a different purpose, because the legislature has declared its intent in sec. 9. The only legitimate office of the section is to give to the act a clear legislative construction, binding on the courts. That is strictly within the power of the legislature to do. That is, the legislature may embody in an act an exposition thereof, setting forth the meaning of the language used, and thereby preclude courts from considering the subject further, perhaps, than to determine whether such meaning can reasonably be ascribed to their language. *Jones v. Surprise,* 64 N. H. 243, 245, 9 Atl. 384; *State v. Schlenker,* 112 Iowa, 642, 84 N. W. 698. That must be the law, since the only office of judicial construction of a law, as before indicated, is to enable the court to see the language thereof in the same light the legislature did. When it speaks plainly on that subject in the law itself, all judicial rules for construction are set aside or rendered useless. If we were able to pass the apparently plain meaning of the act, aided by the equally plain legislative declaration in that regard, we would yet have to pass the explicit exposition of the law made by the executive when he gave it his approval, which we may properly look to in cases of doubt, before reaching a field where any other purpose could be assigned to the enactment than to deal with ice formed on the meandered lakes of the state as its property,—to sell privileges to enjoy such property, for public revenue only.

What has been said leads up to this as the vital question: Is ice, formed naturally upon the public waters of the state, state property in a proprietary sense,—property which it can deal with as a private person deals with his property rights? It must be assumed without discussion that no property right was acquired by the state by the mere legislative declaration that ice formed upon meandered lakes within the boundaries

of the state belongs to the state as property. The legislature has no such arbitrary power, under our constitutional system, as that of changing the nature of the ownership of property by its mere fiat. It can no more accomplish that result in that way than it can change the laws of nature by a legislative declaration. Ice formed on public water is the absolute property of the state independent of any legislative assertion in that regard, or not at all. We would not for a moment indulge in the idea that any branch of the lawmaking power, responsible for placing upon the statute books the enactment in question, thought otherwise. The declaration as to state ownership was a mere proclamation that henceforth the state proposed to sell its ice, or give it away, according as the same was desired for domestic consumption or shipment outside the state, it being supposed, as indicated by the executive approval of the enactment, that the fact of state ownership was not open to question. Of course, if in that there was a misconception of the law, the law remains unchanged notwithstanding. "An enactment of the legislature based on an evident misconception of what the law is will not have the effect, *per se,* of changing the law so as to make it accord with the misconception." *Byrd v. State,* 57 Miss. 243, 247.

What is the real nature of the state's interest in ice formed upon its public waters, if it were not for the attitude of the lawmaking power as indicated, we must confess, in the light of the repeated decisions of this and other courts, would not seem to be open to serious question. As matters stand, we feel constrained to say, it appears that the indications, from the origin of the state's interest in public waters and the purposes to be served thereby, and the judicial declarations in regard thereto in this and other courts, are on one side of the controversy, and the legislation is upon the other. Unless that appearance can be changed, since the proposition involved is purely of a judicial character, there can be no ques-

tion as to which view must prevail. It has been universally supposed, we venture to say, that the right of every person within the state to enjoy its public waters for every legiti-- mate purpose, including the cutting and appropriation of ice, which does not wrongfully interfere with the right of any other person to like enjoyment, subject only to such mere police regulations as the legislature may in its wisdom prescribe to preserve the common heritage of all, is a constitutional right of all persons within the state. While the language used in speaking of the subject is sometimes restrictive, looking at the same only in the literal sense thereof, in that it points only to the people of the state, obviously the rule includes all people lawfully within the state, whether of the state, in the sense of being residents thereof, or otherwise. It has not been supposed that the state could deal with public waters, or with any other thing held upon a like trust to that of such waters, as the proprietor thereof,—that any such thing could be treated in any respect as the absolute property of the state, and used for purposes of revenue. Obviously, there can be no difference between public water in a liquid condition and in the form of ice, or between water and the land covered thereby, or the fish or fowls which inhabit the same, or any of the animals *feræ naturæ,* in respect to sovereign authority over the same. If one may be dealt with as the absolute property of the state, the others may be. It follows that, if the legislation in question be valid, the right to take water from navigable lakes for shipment, though it in no way affect the character thereof for other public purposes, and the right to fish and hunt, may be subjects of sale by the state for the mere purpose of adding to the public revenues; those things which have been supposed to be public and for the individual enjoyment of all without restraint, other than by reasonable police regulations to preserve their character in that regard, things above sovereign authority to barter in as in ancient systems entirely foreign to ours, will

cease to have that character in fact, and our notions in regard thereto will have to be readjusted to the newly established condition,—that which regards the state, not as a mere trustee for the whole people, of the subjects we have mentioned, but as the absolute owner thereof, with power to deal therewith as a private person might if he were such owner.

After the most painstaking investigation which we can give to the act under consideration to the end that it may be sustained, if possible, we confess our inability to discover anything in reason or authority to support the idea of state ownership of ice formed on public waters. The learned attorney general, after exhausting, we must assume, the resources of his office to that end, has not been able to aid us. His printed brief and oral argument as well are implied confessions thereof, and without any reflection, we will say in passing, upon either his industry or ability in the discharge of official duty. The attorney general makes suggestions in regard to how the law might be held valid, by assuming that its purpose is other than merely to traffic in ice; but as we view the law we are not warranted in departing from that purpose. We will say, however, that if we could see any legislative intent to exercise police power to prevent injury to common rights by depleting navigable waters, as the court found in *Sanborn v. People's I. Co.* 82 Minn. 43, 84 N. W. 641, cited to our attention with confidence by counsel for the state, we should hesitate before announcing that the taking of ice from a large body of navigable water could be reasonably legislated against as interfering with common rights by reducing the level of the lake. It was held in that case, in accordance with elementary principles, that the taking of ice from public waters, by any one who can lawfully gain access thereto, is a constitutional privilege,— one common to all persons; and, impliedly, that legislative power in regard thereto extends only to such reasonable regulations as will prevent the enjoyment by one person from invading

the common right of enjoyment. There is no suggestion in the opinion of the court that ice formed on public waters is a subject of state ownership—property which it can sell to replenish its treasury. The action was grounded on the right of a riparian proprietor to prevent injury to his riparian' rights by a lowering of the level of the water. Two members of the court, in a vigorous dissenting opinion which indicates much study of the subject, gave as their view of the law that the right to take ice from public waters for the consumption of the takers, or for sale as an article of commerce, is common to all, and is so superior to riparian rights that the owner of the latter cannot interfere with the enjoyment of the former on the ground that it reduces the level of the water.

This reason is advanced in *Sanborn v. People's I. Co.,* *supra,* for the conclusion there reached, which we are urged by counsel for defendant in error to adopt: While ice formed on public waters is common property, it is not such property for purely commercial purposes; no one has an absolute right to appropriate therefrom more than he needs for his domestic use. If that were so, it would not follow that the surplus ice belongs to the state and may be appropriated for revenue purposes. But the doctrine itself seems to be out of harmony with all well-recognized principles of public waters. As suggested in the dissenting opinion, if the privilege to take ice only entitles each person to sufficient of the common stock for his domestic needs, then the common privileges of fishing and hunting must be likewise limited. We are not aware of any such limitation. The right to take game for sale, or to take water or ice from the public stock for that purpose, has never been questioned under our system, so far as we are aware. To establish the contrary would be a most serious impairment of common rights in navigable waters. Those rights cannot be too carefully guarded. That they extend to the taking of ice for sale, as well as for the domestic

use of the appropriator, has been repeatedly held where public rights in such waters are no more extensive or clearly defined and maintained than in this state. In *People's Ice Co. v. Davenport,* 149 Mass. 322, 21 N. E. 385, the court said:

"It is too well settled to be disputed that the property in the great ponds is in the commonwealth, that the public have the right to use them for fishing, fowling, boating, skating, cutting ice for use or sale, and other lawful purposes."

The supreme court of Iowa, in *Brown v. Cunningham,* 82 Iowa, 512, 516, 48 N. W. 1042, used this vigorous language in condemning the idea of government ownership, strictly so called, in public water:

"The government has no more property in the water than a riparian owner or the public. The beneficent Creator opened the fountains which filled the stream for the benefit of his creatures, and has bestowed no power upon man or governments created by man to defeat his beneficence. Of course the use of the water may be regulated by the state, but the state may not forbid its use to the people."

In the state of Maine it is held that the limit of state authority to interfere with the taking of ice from public waters is the making of regulations which will preserve the common right to do so. *Barrows v. McDermott,* 73 Me. 441; *Woodman v. Pitman,* 79 Me. 456, 10 Atl. 321. In *Brastow v. Rockport Ice Co.* 77 Me. 100, it was held that the right to take ice from a navigable lake is the common right of all and is governed by the same rule as the public right to boat and fish. In *Woodman v. Pitman, supra,* it was held that the right to take ice from navigable waters is as absolute as the right to walk upon the ice. In *Rowell v. Doyle,* 131 Mass. 474, the court said:

"The right of fishing, as well as the right of taking ice in a great pond, is a public right, which every inhabitant who can obtain access to the pond without trespass may exercise, so long as he does not interfere with the reasonable exercise

by others of these and like rights in the pond, and complies with any rules established by the legislature or under its authority."

It must be understood, in considering the above, that the reference to legislative regulations refers merely to such as the lawmaking power may adopt for the purpose of preserving the common rights, not to such as may be enacted to abridge or destroy those rights by treating the ice as state property instead of, if property at all in its natural state, that of the whole people. In *Wood v. Fowler,* 26 Kan. 682, the court said, in effect, that the right to take ice, as the right to take fish in public waters, is in the whole people, and that the first taker becomes, by his act of actual appropriation, the owner. The same was held in *Concord Mfg. Co. v. Robertson,* 66 N. H. 1, 25 Atl. 118, and is laid down by text writers as elementary. Gould, Waters, § 191.

From the foregoing it will be seen that wherever the title to the beds of navigable waters is in the state for public purposes, all the incidents of public waters at common law exist, and that they include the public right of taking ice to the same extent as the right of taking fish.

Up to this point we have not referred to authority in our own state, because we have none that applies, except in principle. We have abundance of judicial authority that applies when it is understood, as the fact is, as clearly indicated by what has been said, that the right to take ice from navigable lakes is of the same nature as any of the incidental rights of the people in such waters. We have demonstrated that, as it seems, if it can be done by reference to authority. We have by no means exhausted the decisions of the courts on the subject, but it seems useless to add more since there are no contrary decisions. We are safe in saying that no court has more definitely declared that the interest of the state in its navigable waters and the lands under them, and all the incidents thereof, are purely of a trust character, the benefici-

aries, on a plane of perfect equality, being the whole people of the state, than this court has done in recent years. In doing that, it is believed, the people have been rescued from all dangers of losing any of those common rights by the invasion thereof by claims of private owners, if such dangers ever existed. That judicial service would be of little value if mere state ownership for the preservation of the common rights were so perverted as to support a claim of state ownership in hostility to such rights, a principle which, in the possibilities of its development, might lead to a serious impairment, if not utter ruin, of a most important trust. Such a consummation would be a very demoralizing example of how the subject of a trust may be converted to the private benefit of the trustee.

This court has repeatedly said that the navigable waters of the state have substantially the incidents of tidal waters at common law; that the title to the beds of such waters was reserved for the state by the Ordinance of 1787, and vested in it at the instant it was admitted into the Union, to preserve the public character of such waters with all such incidents; and that the state never has and never can constitutionally impair the trust. *McLennan v. Prentice,* 85 Wis. 427, 444, 55 N. W. 764; *Willow River Club v. Wade,* 100 Wis. 86, 113, 76 N. W. 273; *Priewe v. Wis. S. L. & I. Co.* 93 Wis. 534, 550, 67 N. W. 918; *Priewe v. Wis. S. L. & I. Co.* 103 Wis. 537, 79 N. W. 780; *Pewaukee v. Savoy,* 103 Wis. 271, 274, 79 N. W. 436; *Mendota Club v. Anderson,* 101 Wis. 479, 78 N. W. 185; *Illinois S. Co. v. Bilot,* 109 Wis. 418, 84 N. W. 855, 85 N. W. 402; *Att'y Gen. ex rel. Askew v. Smith,* 109 Wis. 532, 85 N. W. 512. In *McLennan v. Prentice,* quoting from the opinion of Mr. Justice FIELD in *Illinois Cent. R. Co. v. Illinois,* 146 U. S. 387, 13 Sup. Ct. 110, the court said:

"The right which the state holds in these lakes is in virtue of its sovereignty and in trust for public purposes of naviga-

tion and fishing. The state has no proprietary interest in them, and cannot abrogate its trust in relation to them."

In *Priewe v. Wis. S. L. & I. Co.* 93 Wis. 534, 67 N. W. 918, and again in the same case in 103 Wis. 548, 79 N. W. 780, it was held, in effect, that the state has no such interest in the beds of navigable lakes that it can treat the same as a subject for bargain and sale or grant the same away to private owners under the guise of police power or otherwise; that it is a mere trustee of the title thereto, under a trust created before the state was formed, to which it was appointed as trustee by its admission into the Union; that it has no active duty to perform in respect to the matter, or power over the same, except that of mere regulation to preserve the common right of all; that its power over the *res* is limited by the original purpose of the trust; that it is, in effect, a mere trustee of an express trust, a trustee with duties definitely defined. Those principles are too firmly established to admit, at this late day, of being seriously questioned. It seems clear that if the state cannot sell the bed of a navigable lake, it cannot sell the waters thereof, or the fish therein, or the fowls that resort to its surface, or the ice that forms thereon. The rules that limit its right as to one of those matters, limit its power as to all.

The foregoing seems not only to leave no reasonable, but no possible, doubt as to the conclusion which ought to be reached in this case. It stamps the act in question, indelibly, as the result of a misconception of the state's interest in navigable lakes, and as being baseless and unconstitutional. The title to the beds of such lakes is in the state, but not for its own use as an entity. The mere naked legal title rests in the state, but the whole beneficial use thereof, including the use of the ice formed thereon, is vested in the people of the state as a class. The class opens to let out all who pass beyond, and to let in all who come within, its borders. Presence within the state is all that is necessary to participate in the

common right. Any law to the contrary violates the fourteenth amendment to the federal constitution, guarantying all persons within the jurisdiction of the state the equal protection of the laws. The state can no more appropriate to itself the ice formed upon its navigable lakes, or other navigable waters, than one person can rightly appropriate the property of his neighbor against the latter's will, and pass that title by bargain and sale, or otherwise, to the third person. Since the whole beneficial use of navigable lakes is unchangeably vested in the people, every one within the state having the right to enjoy the same so long as he does not invade the like right of another, without any interference by claim of paramount right to the subject thereof, any law invading that individual possession is, in effect, an invasion of the right to liberty and property without due process of law, contrary to said fourteenth amendment. Any such invasion for the purpose of adding to the public revenues, exacting from a person, for the benefit of the state, compensation for the enjoyment of a right which belongs to him and which he has a right to enjoy without paying therefor, violates sec. 13, art. I, of the state constitution, prohibiting the taking of private property for public use without just compensation.

It is a matter of keen regret that we are compelled to place the stamp of judicial condemnation upon the work of coordinate branches of the government. That is true in any case, but it is especially true here, since it turns to naught a strongly fortified supposed new discovery of a rich source for adding to the revenues of the state. It is the duty of the judiciary to protect, at all points, the constitutional rights of the people from legislative interference. That duty must be performed without hesitation, with firmness and with completeness whenever the necessity therefor arises, or the blessings of constitutional liberty, as we understand the same to exist, will soon fade away. The wisdom of the fathers in securing to the whole people the right to enjoy the navigable

waters of the state, with all their common-law incidents, beyond the possibility of any rightful prejudicial governmental interference therewith, and the consistent and vigorous defense of such right by the judiciary, will be more and more appreciated as time goes on. The right is deemed to be so strongly intrenched that all assaults upon it must fail.

*By the Court.*—The judgment is reversed, and the cause remanded to the trial court with directions to discharge the plaintiff in error.