STATE EX REL. MATTEK and another, Plaintiffs and Respondents, vs. LANGLADE COUNTY and others, Defendants and Respondents, NIMTZ, Defendant and Appellant.

*March 9—April 7, 1931.*

For the appellant the cause was submitted on the brief of *Goggins, Brazeau & Graves* of Wisconsin Rapids.

*James R. Durfee,* district attorney of Langlade county, for the respondents Langlade county and John Callahan, county treasurer, and *Chas. H. Avery* of Antigo, attorney for respondents Hartford, Morgan, and Gibbs, members of the Langlade county normal school board.

For the respondent John Callahan, state superintendent of public instruction, there was a brief by the *Attorney General* and *T. L. McIntosh,* assistant attorney general, and oral argument by *Mr. McIntosh.*

NELSON, J. The issues upon this appeal are rather narrow, yet clear cut and important.

Was the board, as constituted on the 30th day of March, 1929, the duty elected, qualified, and acting county normal school board of Langlade county?

Was the contract entered into with Nimtz on the 30th day of March, 1929, void because not approved by the state superintendent of public instruction?

It may be said at the outset, as found by the court and as both sides concede, that the board as constituted on the 30th day of March, 1929, was a *de facto* board and, as such, had authority to act as a board at that time within the scope of its authority as conferred upon it by law.

The question as to whether the Nimtz contract was void because not approved by the state superintendent of public instruction depends entirely upon the construction and interpretation of the statutes then in force relating to county normal schools.

In construing a statute it is, of course, the duty of the court to ascertain from the law itself the legislative intent and to give it such meaning as the legislature intended. *Rossmiller v. State,* 114 Wis. 169, 178, 89 N. W. 839; *State ex rel. Monroe County v. Vernon County,* 148 Wis. 274, 134 N. W. 360. In construing several sections of the statutes relating to a single subject it is the duty of the court to give force and effect to the different sections and not ignore any of them. *Estate of Schranck,* 202 Wis. 107, 230 N. W. 691. "Language found in any statute must be construed with reference to the context in which it is found and the purpose sought to be accomplished by the statute." *Wisconsin Livestock Asso. v. Bowerman,* 202 Wis. 618, 233 N. W. 639, 640. "The aim in all cases should be to find out what the legislature really meant and not to stretch or distort language so as to make the law as the court thinks it should be for the purposes of the individual case under consideration." *International Harvester Co. v. Industrial Comm.* 157 Wis. 167, 179, 147 N. W. 53.

These well established principles of statutory construction must be kept in mind in order that a true and correct interpretation of the several statutes involved may be had. The particular statutes involved in this controversy are secs. 20.31 and 41.36 to 41.41 of the Statutes of 1927. Secs. 41.36 to 41.41 clearly related to the organization and maintenance of such schools. Sec. 41.37 provided among other things as follows: "A county normal school board is created, which shall have charge and control of all matters pertaining to the organization, equipment and maintenance of such schools." It is not perceived how language could be broader in granting full power to the board. Certainly the language, "shall have charge and control of all matters pertaining to the organization, equipment and maintenance of such schools," when construed in connection with the board upon which such authority is conferred, is amply broad, in the absence of a provision specifically limiting its authority to hire a principal, to grant such power and authority. This authority was limited only by the provisions of sec. 41.41, which provided the minimum qualifications for both teachers and principals employed in such schools.

Sec. 41.41 was as follows:

*"Same; qualifications of teachers and principal.* No member of any county normal school board shall be employed in said school, either as principal or as teacher, during the term for which he was elected, nor shall any person be employed as a teacher in such school who does not hold a state license or certificate, nor shall any person be employed as principal of such school who is not legally qualified for the position of principal of a high school having a four years' course of study. This section shall not apply to any person engaged as a teacher in a county training school, on July 16, 1907."

It is obvious that there is nothing in any of these sections just considered which even suggests that a county normal school board had no authority to hire a principal, provided, of course, that such principal be not a "member of the

county normal school board" and "is legally qualified for the position of principal of a high school having a four years' course of study." The qualifications mentioned are those specified in sec. 39.28 of the Statutes.

Turning now to sec. 20.31 of the Statutes of 1927 we find that it was a part of ch. 20, relating to appropriations, and specifically stated the conditions upon which state aid could be given to county normal schools. Sec. 20.31 (2) (a) provided in part as follows:

"(a) The state superintendent shall keep a list of such training schools, whose course of study and the qualifications of whose teachers have, on application, been approved by him; and any such training school once entered on such list may remain listed and be entitled to state aid so long as the scope and character of its work are maintained in such manner as to meet his approval, but such sums shall be paid only to training schools on the approved list of the state superintendent on January 1, 1927."

Sub. (2) (c) of said section further provided:

"(c) If it shall appear that such training school has been maintained, pursuant to law, for a period of not less than nine months during the preceding school year, in a manner satisfactory to the state superintendent, he shall certify to the secretary of state in favor of each such training school, an amount equal to the sum expended for instruction, school supplies and operation during the school year; but not to exceed six thousand dollars to any school employing two teachers, and not to exceed eight thousand dollars to any school employing three teachers, and not to exceed ten thousand dollars to any school employing four or more teachers. Any such training school maintained for more than nine months during the school year shall receive for such additional time an additional sum of money in the same proportion to the amount receivable for nine months as such additional time bears to nine months. The number of teachers in each such school, the salaries paid to each teacher, and the qualifications for teachers shall be approved by the state superintendent."

It is equally obvious that there was nothing in sec. 20.31 which limited the authority of a county normal school board as conferred by secs. 41.37 to 41.41, hereinbefore considered, or which required a contract entered into between such board and the principal to be approved by the state superintendent as a condition precedent to its validity. Sec. 20.31 specifically and plainly provided the conditions to be complied with in order that a given school might be entitled to state aid. There cannot be the slightest doubt that in order that a school might be entitled to the state aid afforded by this section the qualifications of the teachers of such school had to be, on application, approved by the state superintendent; the school had to be maintained pursuant to law and in a manner satisfactory to the state superintendent; and the salary paid to each teacher had to be approved by him. These were the statutory conditions upon which the state superintendent was authorized to certify that a given school was entitled to state aid. There was no provision anywhere in the statutes requiring a principal's or teacher's contract to be approved by the state superintendent independent of the question of state aid.

Sec. 41.39 of the Statutes specifically provided what the relation of the state superintendent of public instruction was to the county normal schools. Such section provided that he was to assist in organizing and maintaining such schools, prescribe the course of study, and have general supervision of such schools. He was to inspect them, make recommendations and full reports concerning their number, character, and efficiency.

It will be noted that this section, dealing specifically with the duties of the state superintendent, in no manner required him to approve of contracts with teachers or principals or to approve the qualifications of teachers or principals who contracted with county normal school boards.

The conclusion which must inevitably follow from a careful consideration of the language found in the statutes is strongly supported by the history of sec. 41.39. When it was originally enacted by the legislature of 1899, ch. 268, Laws of 1899, sec. 4, contained the following language relating to the powers and duty of the state superintendent: "And shall determine the qualifications of all teachers employed in such schools." This clause, however, was stricken out by the legislature in 1907 (ch. 601, Laws of 1907) and the qualifications for teachers and principal added to the statute as a part of sec. 41.41. In 1925 the legislature, by ch. 240, Laws of 1925, added to sec. 20.31, sub. (2) (a), the following language: "The number of teachers in each such school, the salary paid to each teacher, and the qualifications for teachers shall be approved by the state superintendent." This language became a part of the statute which definitely provided the terms and conditions upon which state aid could be obtained.

It seems too plain for controversy that had the legislature intended that all teacher's or principal's contracts should be valid only on condition that they were approved by the state superintendent, it would have been a simple matter so to provide. Whatever the opinion of this court may be as to the wisdom of such a requirement, it has no power to legislate or to read into a legislative enactment something which plainly is not there.

As the law existed in 1929 and now exists, no county normal school board is entitled to state aid pursuant to the provisions of sec. 20.31 unless the number of its teachers, the salaries paid to them, and their qualifications shall be approved by the state superintendent. Nor is such a school entitled to aid unless it had been maintained as required by said section and in a manner satisfactory to the state superintendent. This is the clear intent of the statute, and is, in fact, not controverted by the parties. As a practical

proposition, every such school which hopes for state aid will no doubt, as a "safety first" precaution, obtain the approval of the state superintendent as to the number of teachers to be employed, the salary to be paid them, and as to their qualifications; but the validity of a contract entered into with a teacher or principal is not dependent upon the approval of the state superintendent. State aid is dependent upon such approval; not the validity of the contract.

So we conclude that the Langlade county normal school board as it was constituted on March 30, 1929, was a *de facto* board and, as such, had authority to enter into a contract with Mr. Nimtz, and that the validity of such contract was not dependent upon the approval of the state superintendent. For the reasons stated, the judgment of the circuit court for Langlade county, in so far as it denies the validity of the contract entered into with defendant Frank J. Nimtz, because not approved by the state superintendent, must be reversed.

*By the Court.*—Judgment reversed.