(43 Misc. Rep. 221.)

### AMERICAN ICE CO. v. CATSKILL CEMENT CO.

(Supreme Court, Special Term, Ulster County.   March, 1904.)

1. NUISANCE—INJUNCTION—POLLUTING ICE FIELD.

An ice company owned land bordering on the Hudson river, and made the ice formed between its lands and the center of the river its personal property, by staking it out as required by Laws 1895, p. 882, c. 953, § 1, and Laws 1899, p. 486, c. 264, § 2. *Held*, that it was entitled to restrain a neighboring cement company from so operating its works during the season for harvesting ice as to throw on the ice cinders, ashes, coal dust, and other substances which might sink into the ice and render it unmerchantable; such operation being a nuisance, as an unreasonable use of defendant's property to the annoyance and damage of another.

Action by the American Ice Company against the Catskill Cement Company.   Judgment for plaintiff.

G. D. B. Hasbrouck, for plaintiff.

Osborn & Bloodgood (John J. Linson, of counsel), for defendant.

BETTS, J.   This is an action in equity, in which the plaintiff, by its verified complaint, shows, among other things, that it is the owner and occupant of six several icehouses, and lands connected therewith, along the Hudson river, in the counties of Ulster, Greene, and Columbia, and that it is engaged in the business of harvesting and housing ice in the icehouses situated upon the said several properties, and later marketing the same; that, as appurtenant to the ownership of said several parcels of real estate, it owns the right, privilege, and franchise of gathering ice between each of said properties and the center of said Hudson river, as provided by chapter 953, p. 882, of the Laws of 1895, and chapter 264, p. 486, of the Laws of 1899, and that it requires the ice formed in said river, between the center thereof and said several parcels of land, for the purpose of filling its said several icehouses; that the defendant has near said several properties a large manufacturing cement plant, which is in operation, and that in its operation during the months of December, January, and February, while said ice is forming or being harvested, it causes large quantities of dense smoke, ashes, cinders, coal dust, clay dust, and soot to escape from its said plant and works and settle upon the plaintiff's said ice fields, which blackens, discolors, and corrupts the same, and renders it unwholesome and unmerchantable; that said acts of the defendant deprive the plaintiff of the enjoyment and use of its privileges and properties, and have greatly diminished the value thereof, and are a nuisance, which defendant refuses to abate, although requested; that the principal part of plaintiff's business is supplying the market with ice; that the injury caused to plaintiff's property and business by such acts of the defendant is irreparable; that the defendant is not of sufficient financial ability to respond to the damage which it has inflicted and is inflicting; and the plaintiff asks judgment against the defendant for its damages, and for a perpetual injunction against the defendant from so operating its cement works as to produce the said nuisance, and that a preliminary injunction may be granted pending the trial of this action.

Various affidavits substantiating the allegations of the complaint were submitted with it, and upon such papers and a sufficient bond the defendant was enjoined from so continuing its works until the further order of the court, and the defendant was ordered to show cause why the injunction should not be continued pending the trial of the action. On said hearing the defendant appeared, and the question is now before me, sitting at chambers, to determine whether the injunction heretofore granted should be continued during the pendency of this action for such time in each year as the plaintiff may with reasonable celerity require for the gathering and storing of its ice crop in said several houses.

The affidavits submitted by the plaintiff on the argument go very minutely into the conditions of the ice up to practically the time of the hearing, and they show that the operation of the defendant's cement plant throws off large quantities of dense smoke, ashes, cinders, coal dust, clay dust, and soot, which, when the wind is in the right direction for that purpose, settle and fall upon the plaintiff's ice and ice fields, and that, as the ice softens, said cinders, ashes, dust, and soot settle into the ice; that the icehouses in question have a capacity, approximately, of 200,000 tons; that the ice in front of the said properties has been staked out; that the action of defendant's said plant renders the ice impure and unmerchantable, and, if not enjoined, would destroy the crop at said several properties; that the ashes and other materials thus thrown upon plaintiff's property have formed a web or scum thereon, and sunken into and become incorporated into the ice and ice crop, already soiling and injuring it; that it is impossible and impracticable for the plaintiff, by any means within its power, to save or preserve its ice on said fields from the result of the action of the defendant's mills; that the fields this season have been in a measure protected by snow, which has rested upon said ice to such a depth as to keep the ashes and other materials from doing as much damage as it otherwise would, since the snow is removed by scraping before the ice is cut. In addition to the affidavits submitted, numerous pieces of ice taken from said fields were produced before the court on such hearing, and were certainly in a very impure state, from some reason, alleged to have been the action of the defendant, and clearly unmerchantable to such parties as might desire wholesome and pure ice.

The defendant at the time of the argument had not answered. It, however, produced on the hearing several affidavits—among others, one of its secretary and treasurer, showing that the business of the defendant is a large and important one, its daily product being upward of 900 barrels of cement, fairly worth $1 a barrel, and it employs upward of 250 men regularly; that it owns about 375 acres of land at the place in question, and that the clay and rock upon the said land contain the necessary properties for the manufacture of a high grade of Portland cement; that the machinery used in its manufacture is the newest and best known to the trade, and calculated to waste and discharge the minimum of dust; that it is absolutely impossible to manufacture its cement without making and discharging more or less dust, smoke, and soot, and it is necessary for it to oper-

ate its mill continuously for it to supply its trade; that it is not operated negligently, "and no smoke, dust, or soot is unnecessarily discharged by the mill and deposited upon ice formed in said river or upon adjacent premises; that no ashes or cinders are thrown by said mill upon such ice or adjacent premises"; that near its mill and near the plaintiff's properties in question is a similar and larger cement mill, worked in the same manner, and that the locomotives of the Hudson River and West Shore railroad trains to a large number pass up and down each side of the said river and said ice fields daily; that smoke, soot, and dust from defendant's said plant do settle upon said ice to some extent, but do not blacken and corrupt the ice in the river and render the same unwholesome and unmerchantable. The affidavits of many people also were submitted by the defendant, some of the affiants stating that they had examined and inspected the said ice fields at numerous points selected at random; "that deponent found the said ice to be of a superior quality, and unusually free from dirt or other objectionable matter of any kind"; that, upon a day or days when affiants were on the river, smoke, cinders, coal dust, clay dust, or soot from defendant's mill and the other large mill then in full operation were not thrown on said ice; that defendant's assets exceed its liabilities by upward of $75,000; that the ice has been affected by the cinders and soot frequently, in prior winters, from the locomotives of the New York Central Railroad; and that sand has been blown upon the same from the shores.

For many years since the settlement of the valley of the Hudson, the river has been generally considered simply as a highway for boats in the summer, and for pedestrians and horses and sleighs in the winter, and, of course, with the rights of fishery and other minor rights. In later years, however, it has become a very profitable field of employment for capital and labor for removing the ice therefrom in the winter time, storing it in houses conveniently situated along its banks, and in the summer time taking it by boats to New York City and other large markets. Such an important industry has this become, that we find the Legislature of this state so early as 1860 placing restrictions upon the manner in which said ice should be harvested, and various acts recognizing and regulating said industry have since, from time to time, been enacted. In other jurisdictions the great importance of this industry has been recognized, as is shown by the following quotation from Woodman v. Pitman, 79 Me. 461, 10 Atl. 321, 1 Am. St. Rep. 342, where ice takers were given the preference over travelers on the ice:

"On the other hand, the business of gathering ice for merchantable purposes has assumed extraordinary importance on our rivers. Large amounts of capital are invested. Thousands of men and of teams are employed at a season of the year when other employment cannot be obtained by them. The outlay is mostly in bills for labor, widely circulated. A crop of immense value is annually produced from an exhaustless soil without sowing. The shipping business is materially aided by it. The wealth of the state is greatly increased by it. It is eminently a business of the people."

It has been the law in this state, until the Legislature otherwise decreed, that this ice was common property, and belonged to the first appropriator, so that contests over the possession and right to

harvest it frequently occurred. Slingerland v. International Contracting Co., 169 N. Y. 72, 61 N. E. 995, 56 L. R. A. 494. In 1895 the Legislature passed chapter 953, p. 882, by which, so far as is necessary for our purpose, it provided that "whenever the owner * * * of lands bordering upon the Hudson river shall require the ice formed in said river between the center thereof and said lands for the purpose of filling any icehouse or icehouses, now erected, or which may at the time of the formation of such ice hereafter be erected on any such lands * * * such owner * * * shall have the exclusive privilege of cutting and harvesting all the ice so formed in said river in front of and adjacent to said lands and between the same and the center of said river: provided such owners * * * shall have indicated their intention of exercising such privilege by staking out so much of said ice as shall be required for said purpose," and providing further that such staking out shall not be required to be done until the ice had attained a thickness of four inches, and that the cuttings should be surrounded by fences of bushes, etc., and also providing that it shall not be lawful for any persons other than the owner to take possession of or cut the ice so staked out. This law was amended by chapter 264, p. 486, of the Laws of 1899, section 2 of which amendment is as follows:

"Whenever such ice shall have been so staked out, all ice lying between the centre of the said river, as hereinafter defined, and such lands, or so much thereof as shall be required for the purpose of filling the icehouse or icehouses erected thereon, as aforesaid, shall be and become the personal property of the owner or owners, lessee or lessees of such lands and icehouses and any person or persons trespassing upon or taking the same for commercial purposes or otherwise, shall be liable to such owner or owners, lessee or lessees, for the value of the ice so taken, and for any damage, in like manner as for an injury done to any other property, and an action may be maintained for a permanent injunction, or for the value of the ice so taken, or for any damage; and a temporary injunction may be granted, restraining any defendant or defendants from trespassing upon or taking the said ice for commercial purposes or otherwise, pending the determination of the action. The granting of such temporary injunction shall be subject to the provisions of title second of chapter seventh of the Code of Civil Procedure."

Thus, under this statute, and after complying therewith, the plaintiff claims that it is the absolute owner of this ice formed in these fields, with the full right to invoke the aid of the court to protect its property rights therein from any nuisance, the same as it could do for the invasion of any other property rights of it unlawfully assailed by the defendant, and that the operation of defendant's plant while ice is forming and being harvested is a nuisance to its properties, and a trespass thereon.

The state of New York is the owner of the water in the bed of the Hudson river—if not the absolute owner, at least the trustee for the people of the state, subject to the authority of Congress to regulate commerce. Rogers v. Jones, 1 Wend. 255, 19 Am. Dec. 493; Trustees of Brookhaven v. Strong, 60 N. Y. 56; Roberts v. Baumgarten, 110 N. Y. 380, 18 N. E. 96. At the time when this ice is being harvested, there can, by the acts of the plaintiff, be no interference with the rights of navigation in said river. The state by these acts of its Legislature prevents strife and contention between its

citizens in the gathering of the ice, which experience has shown has resulted and would be likely to result if there were no restraints put thereon. It also says, in effect, to the owners of adjacent uplands, that upon complying with its statutes the ice shall belong to them. The plaintiff has complied with the statutes. Its ice has been reduced to possession so far as the same can be done by a compliance with the statute. I can see no reason why its property in said ice should not be protected by the courts, if assailed, without regard to the exact status of the property thus acquired. The plaintiff has parted with value to acquire this property, so that it becomes to it a valuable property right.

The question then recurs, is the operation of the defendant's plant in the manner claimed by the plaintiff, and to the extent not denied by the defendant, a nuisance? It is admitted by the defendant that it so conducts its business that certain material from its property finds its way upon the ice fields of the defendant. It claims, however, that it is conducting a lawful business in a careful manner upon its own premises, and that whatever escapes upon the plaintiff's property is to its own injury, for the loss of the product, and does not injure the ice of the plaintiff to any great extent.

The case of Campbell v. Seaman, 63 N. Y. 568–577, 20 Am. Rep. 567, was an action for damages resulting from an alleged nuisance, and to restrain its continuance, in which it appeared that the defendant owned a brickyard adjoining plaintiff's dwelling house and lands. During the process of burning brick, sulphuric acid gas was generated by the use of anthracite coal, which, when the wind blew in the right direction, was carried to the plaintiff's grounds, killing and destroying his trees and shrubbery. Such brick could not be successfully manufactured without such use of coal. A judgment for damages and for an injunction was sustained; Judge Earl writing the opinion therein, in which, on page 577, 63 N. Y., 20 Am. Rep. 567, he says:

"But every person is bound to make a reasonable use of his property, so as to occasion no unnecessary damage or annoyance to his neighbor. If he make an unreasonable, unwarrantable, or unlawful use of it, so as to produce material annoyance, inconvenience, discomfort, or hurt to his neighbor, he will be guilty of a nuisance to his neighbor. And the law will hold him responsible for the consequent damage. As to what is a reasonable use of one's own property cannot be defined by any certain general rules, but must depend upon the circumstances of each case. A use of property in one locality and under some circumstances may be lawful and reasonable, which under other circumstances would be unlawful, unreasonable, and a nuisance. To constitute a nuisance, the use must be such as to produce a tangible and appreciable injury to neighboring property, or such as to render its enjoyment specially uncomfortable or inconvenient."

This case has never been questioned, and was referred to as lately as Bates v. Holbrook, 171 N. Y. 470, 64 N. E. 181, and Bly v. Edison Electric Illum. Co., 172 N. Y. 10, 64 N. E. 745, 58 L. R. A. 500, as being the approved law of this state.

In Bly v. Edison Electric Illum. Co., 172 N. Y. 9, 64 N. E. 745, 58 L. R. A. 500, a nuisance is defined to be "unreasonable, unwarrantable, or unlawful use of one's own property, to the annoyance, inconvenience, discomfort, or damage of another." The plaintiff here is

not complaining of the defendant's occupancy or user of its own premises in its own business, but it complains of the defendant occupying and using premises and property of plaintiff as a receptacle for its (defendant's) cinders, ashes, clay dust, coal dust, and soot, thereby injuring and destroying its ice. It is conceded that the defendant may do as it likes upon its own premises, but when it throws its smoke, dust, and soot upon the ice of the plaintiff, it has left its own domain, and gone upon property of the plaintiff, injuring plaintiff's property. I think it thereby becomes a nuisance. It takes property of the plaintiff, for the right to obtain which plaintiff has purchased lands, erected icehouses, and staked out ice fields, and appropriates such property as a receptacle for its smoke, dust, and soot, which should be restrained on its own soil. It makes no difference that this injury only occurs when the wind is in the right direction to carry defendant's soot and other substances to plaintiff's ice fields and is not continuous. Campbell v. Seaman, supra. Nor that defendant's business is not carried on negligently. The injury is just as great to plaintiff's property as it would be if defendant negligently cast its products thereon. Bohan v. Port Jervis G. L. Co., 122 N. Y. 18, 25 N. E. 246, 9 L. R. A. 711.

I conclude, then, from the papers and exhibits submitted, that an injunction should issue pending this litigation, restraining defendant from so operating its cement plant as to throw said materials complained of from the same upon the said ice fields of the plaintiff while ice is forming, and while the plaintiff, with reasonable celerity, is gathering the same. It is not intended that this injunction shall in any way restrain defendant's operations, except in the manner and at the time suggested, and the plaintiff must immediately give personal notice to defendant when its said houses are filled, or it has harvested all it cares to do for the season; and, if it apparently appears that the injunction directed is being used for the purpose of delaying defendant's use of its plant, defendant may apply to any term of this court, or justice thereof, on three days' notice to plaintiff, for its modification.

Ordered accordingly.