## STATE *v.* MALLORY.

Opinion delivered December 3, 1904.

1. GAME AND FISH—STATE'S OWNERSHIP DEFINED.—The State's ownership of fish and game is not such a proprietary interest as will authorize a sale thereof, or the granting of special interests therein, or license to enjoy, but is solely for the purposes of regulation and preservation for the common use, and is not inconsistent with a claim of individual or special ownership by the owner of the soil upon which they are found. (Page 241.)

2. SAME—RIGHT OF LANDOWNER.—The owner of land has, by virtue of such ownership, a special property right to take fish and wild game upon his own land, subject to the limitation that it must always yield to the State's ownership and title, held for the purposes of regulation and preservation for the common use. (Page 244.)

3. GAME AND FISH ACT—VALIDITY AS TO NONRESIDENT LANDOWNERS.— Acts 1903, c. 162, § 4, providing that "it shall be unlawful for any person who is a nonresident of the State of Arkansas to shoot, hunt, fish or trap at any season of the year" is, as to nonresident landowners, a denial of "the equal protection of the law," and taking of property "without due process of law," within the Fourteenth Amendment to the Constitution of the United States. (Page 250.)

Appeal from Crittenden Circuit Court.

ALLEN HUGHES, Judge.

Affirmed.

*George W. Murphy, Attorney General, S. R. Simpson, Geo. W. Williams, Henry M. Armistead,* and *Cantrell & Loughborough,* for appellant.

The act contains no exceptions, and applies alike to all non-residents of the State. *Cf.*, Acts 1903, 306, § 4. The property in game is in the State, and it has full power to regulate or prohibit the killing thereof. 161 U. S. 524; 2 Bl. Comm. § § 395, 410, 411; 56 Ark. 251; 29 Ind. 409; 101 Mich. 98; 103 Mass. 452; 160 Mass. 157; 97 Ill. 320; 61 Conn. 144; 103 Cal. 476; 133 Ill. 649; 58 Minn. 593; 1 Halst. 71; 48 N. J. L. 90. The statute of 1903 is not unconstitutional. 94 U. S. 395; 130 N. Y. 455; 14 R. I. 398; 7 Mo. App. 524; 139 U. S. 240.

*Rose, Hemingway & Rose, James P. Clarke* and *T. K. Riddick,* for appellee.

The fourth section of the statute of April 24, 1903, has no application to the case of a landowner who hunts on his own lands, and who fishes in a lake or unnavigable river surrounded by his own lands. When a statute is susceptible to two constructions, one of which will render it unconstitutional and the other one valid, it will be presumed that the Legislature intended that construction which will render the statute valid. 56 Ark. 495; 58 Ark. 438. And in arriving at the proper construction the court will look to the entire act and the mischief intended to be remedied, and give to the words of the statute a construction which will effectuate the legislative intent and not violate the fundamental law. 24 Ark. 155; 25 Ark. 101; 37 Ark. 495; 29 Ark. 356; 32 Ark. 462, 465; 34 Ark. 363; 35 Ark. 60; 60 Ark. 129; 58 Ark. 117; 40 Ark. 431; 61 Ark. 233; 65 Ark. 529; 27 Ark. 419; 28 Ark. 203; 48 Ark. 305; Crawf. Dig., column 340. See especially, construing game statutes according to these principles; 34 Atl. 170; 76 Me. 80; 71 Mich. 325, s. c. 39 N. W. 1; 128 Mass. 410, s. c. 35 Am. Rep. 383; 139 Pa. St. 298, s. c. 21 Atl. 14; 17 Mo. App. 524; 83 N. W. 1012; 121 N. Y. 97, s. c. 24 N. E. 484. The statutes *in pari materia,* passed by the same session of the Legislature, afford evidence that the statute was not intended to restrict or apply to private property. *Cf.* Acts 1903, 82, 299, 306, 195; End. St. § 45. Further upon the proposition that the statute of 1903 was not intended to restrict or apply to rights of private property, see: 9 Can. Sup. Ct. 210; Ir. Rep. C. L. 143; 6 Can. Sup. Ct. 116; 53 N. H. 398, s. c. 16 Am. Rep.

339; 22 L. R. A. 439. If section 4 of the act of 1903 does prohibit nonresident landowners from hunting and fishing upon their own lands, it is unconstitutional. Const. U. S., Amend. XIV; Const. Ark. art. 2, § 8. Fish and game are the property of the landowner, subject only to the right of the State to regulate their taking by police regulations. *Cf.* 1 Fed. 481; 12 Pet. 436, defining "property." *Cf.* also: 15 Ore. 208, s. c. 3 Am. St. 153; 2 Washb. R. Prop. 632, 400; Wood, St. Fr. § 6. Further, to the point that the owner of the soil has property in the game, and as to distinction between license and easement in regard to such rights, see: 1 Dom. Civ. L. tit. 8, § 10*n*; 69 Mich. 488, s. c. 13 Am. St. 405; 38 L. R. A. 205; 36 Oh. St. 396; *Ib.* 423, s. c. 38 Am. Rep. 599; Wood, St. Fr. § 5; *Ib.* pp. 879, 883; Black's L. D. 405; 2 Bl. Comm. 32; 19 Ark. 35, 38; 2 Washb. R. Prop., Bk. 2, § 1, p. 270; 1 *Ib.* 636, 637, 400; 5 Ired. Law, 188, s. c. 42 Am. Dec. 155, 158. More particularly, upon the question of property in game and fish, see: 20 Johns. 90, s. c. 11 Am. Dec. 249; 5 Pick. 199, s. c. 16 Am. Dec. 386; 24 Me. 482; 59 N. H. 256; s. c. 47 Am. Dec. 199; 15 R. I. 35, s. c. 2 Am. St. 863; 6 Sawy. 451; Coke, Litt. 4*b*; 14 L. R. A. 386; 48 L. R. A. 616; 33 Pac. 1099; 4 Johns. 25; 17 Johns. 195, s. c. 8 Am. Dec. 382; 6 Cowen, 376; 4 Bl. Comm. 235; 5 Ired. Law, 118; s. c. 42 Am. Dec. 155, 156; 43 Ill. 447; 92 Am. Dec. 146; 5 Pick. 199, s. c. 16 Am. Dec. 386, 389; 4 Pick. 145, s. c. 16 Am. Dec. 33; 20 Johns. 90, s. c. 11 Am. Dec. 249; 3 Ired. Law, 200; 38 Am. Dec. 722; 17 Conn. 594; 10 Am. & Eng. Enc. Law (2d Ed.), 410; 75 Me. 421; 8 Gill & J. 50; 94 U. S. 391. This right to fish and hunt upon one's own land is such a "privilege or immunity" as is guarantied to citizens of one State in another by art. IV, sec. 2, Const. U. S. 94 U. S. 395. The Legislature had no power to take away this right. Art. 2, Sec. 22, Const. Ark.; 7 Cal. 347; 40 *Id.* 194; 10 N. J. Eq. 211; 77 Wis. 28, s. c. 20 Am. St. 123. A profit in lands is an interest in lands, and a consequence of such interest is within the statute of frauds. 2 Gray, 302; 53 Pa. St. 201, s. c. 91 Am. Dec. 203; 33 Am. Dec. 138; 5 Sneed, 597; 9 Metc. 395, s. c. 43 Am. Dec. 399; 43 N. J. Law, 28; 6 Cal. 66; 28 Ind. 26; 5 Barb. 379; Wood. St. Fr. § 214; 1 Dev. Deeds, § 63. With the construction asked by appellant the act would be unconstitutional because it would discriminate between the citizens of this State, by denying to such of them as

happened to be resident abroad temporarily the equal protection of the law. Const. U. S., Amend. No. XIV; Const. Ark., Bill of Rights, § § 18, 21; 43 Ark. 547; 8 Wall. 180. The statute of 1903 is also violative of art. II, sec. 22, Const. Ark. *Cf.*, applying this guaranty to riparian rights: 142 U. S. 254; 60 Conn. 278; 75 Ill. 41; 68 Mass. 444; 134 Mass. 267; 23 N. J. L. 624; 24 Ia. 336; 5 Wend. 423; 45 Neb. 798; s. c. 64 N. W. 239; 26 Wend. 404; 2 Seld. 522; 35 N. Y. 454; 16 Oh. 540; 4 Brewst. 332; 24 Ia. 336; 51 Ark. 272. If the act of 1903 is to be construed to mean what it expressly states, it is unconstitutional because it prohibits a nonresident from hunting on his own lands. If this be not its meaning, it is void for uncertainty. 45 Ark. 158, 164; 3 Sumn. 279; 91 U. S. 550, s. c. 49 Am. Rep. 652; Suth, St. Const. § 261; 4 Dev. (N. C.) 110; 92 U. S. 214; 100 U. S. 82; 114 U. S. 304.

*George W. Murphy, Attorney General, Cantrell & Loughborough, H. M. Armistead* and *Geo. W. Williams,* for appellant in reply.

The State had power to pass the statute of 1903 and to prohibit the killing of game as it saw fit. 98 Fed. 295; 96 Tenn. 682; 142 Ill. 30; 2 Bl. Comm. 392.

*James P. Clarke* and *Rose, Hemingway & Rose,* for appellees in reply.

See further that statute does not apply to hunting and fishing on one's own land: 53 N. H. 398, s. c. 19 Am. Rep. 339; 83 N. W. 1012; 121 N. Y. 313, s. c. 24 N. E. 484; 22 Atl. 159; 23 Ia. 304. The right to hunt and fish on one's own land is a right in the soil. 55 Atl. 656.

McCULLOCH, J. The General Assembly of the State enacted a statute, approved April 24, 1903, entitled "An act to protect the game and fish of the State, and provide for the appointment of game wardens," and the prosecution in this case is based on the fourth section of that act, as follows:

"Section 4. It shall be unlawful for any person who is a nonresident of the State of Arkansas to shoot, hunt, fish or trap at any season of the year." Acts 1903, c. 162, § 4.

In other sections of the act the open and closed seasons for killing certain kinds of game are declared, and penalties for violations thereof are prescribed; the exportation of game or fish out of the State is prohibited, and penalties therefor prescribed; and the sheriffs of the State are made game wardens for their respective counties, with power to make arrests and prosecute offenders against the statute.

The appellee, Mallory, was tried upon the charge of hunting in the State, being a nonresident at the time, and from a finding of not guilty by the court and judgment discharging him the State has appealed.

The case was tried below before the court sitting as a jury, by consent of parties, and upon the following agreed statement of facts:

"I. The defendant, Mallory, is a native of the State of Virginia, and a *bona fide* resident and citizen of the city of Memphis, and the State of Tennessee.

"2. That he is the owner in fee of a large body of land in the County of Crittenden, State of Arkansas, by successive deeds, the title thereto originating by a grant from the State, on which he has continuously carried on planting and farming operations for many years prior to this date; and in the prosecution of his said farming operations he has had occasion to make frequent visits to said land.

"3. That on said tract of land there is a pond, or non-meandered lake, surrounded entirely by the land of the defendant, without outlet or inlet except at times of overflow; in which body of water fish are to be found and may be taken therefrom by ordinary methods.

"4. That on said tract of land squirrels and other game are to be found.

"5. That for many years the defendant has been in the habit of hunting for game on said lands and taking fish from said waters, both by himself and those who had his permission so to do; and that the right to kill said game and to take such fish is valuable, and adds to the value of the lands.

"6. That on the 18th day of June, 1903, the defendant engaged in hunting on said lands for squirrels.

"7. That on the 18th day of June, 1903, the defendant engaged in fishing in the said waters above described, and took therefrom by means of hook and line fish found therein."

It is contended here, on the part of the State, that the wild game and fish in this State are its absolute property, and that it may lawfully prohibit the taking of game and fish by all non-residents, and that the act in question is a valid prohibition against nonresidents owning lands in the State hunting or fishing thereon.

The appellee insists, on the other hand, among other things, that his right to take game and fish while on his own lands is a valuable property right which inheres by reason of his ownership of the soil, and, being so, this act is an unjust discrimination against him as a property owner of the State, in violation of that portion of the Fourteenth Amendment to the Constitution of the United States, as follows:

"No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, nor shall any State deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the law."

The proper solution of these questions involves an inquiry as to the ownership of game, a consideration of the nature of the property therein, whether exclusive and absolute or qualified, and the extent of the authority which the State has a lawful right to exercise in relation thereto.

It can be stated without question that, primarily, the title to game and fish are and have for all time been in the sovereign, but the nature and extent of that title and the purposes for which it is held are not altogether free from doubt. Originally, the title seems to have been regarded as vested in the sovereign as a personal prerogative, but as civilization advanced it grew to be differently regarded, not as a personal right of kings, but as a portion of the common property of subjects. It is said that by the Roman law animals *ferae naturae* were classified as common property, which, having no owner, were considered as belonging to all the citizens of the State; yet the right of an owner of land to forbid another from killing game on his property was recognized as a part of the rights of ownership of the land. Inst. Just., book 2, part 1.

The ownership of such animals seems to have been assumed by British sovereigns up to and including King John I, as a personal prerogative of the crown until Magna Charta and the Charter of the Forest, by which the assertion and exercise of those rights were distinctly limited. Since then the ownership of wild animals, so far as vested in the sovereign, has been uniformly regarded as a trust for the benefit of the people, and we think that clearly, in effect, the title and ownership of the sovereign has been held to be only for the purpose of protection, control and regulation. Mr. Justice White, speaking for the court, in *Geer* v. *Connecticut,* 161 U. S. 519, says:

"The practice of the government of England from the earliest time to the present has put into execution the authority to control and regulate the taking of game. Undoubtedly, this attribute of government to control the taking of animals *ferae naturae,* which was thus recognized and enforced by the common law of England, was vested in the colonial governments, where not denied by their charters, or in conflict with grants of the royal prerogative."

But nowhere do we find in modern times that the absolute and unqualified ownership of such animals by government has been asserted and exercised further than for the purpose of controlling and regulating the taking of the same. On the other hand, we find frequent denial of the right of government to do more.

In *Bristow* v. *Cormican,* 24 Moak, 431, it was decided that the crown has no *de jure* right to the soil or fisheries of an inland nontidal lake, and that a general grant by the crown of a right of fishing in a nontidal lake is not, without more, sufficient to establish the title thereto.

In *Venning* v. *Steadman,* 9 Canada Sup. Ct. R. 210, the right of riparian owners of land on a nonnavigable river to fish for salmon was involved, in the face of a statute providing that "fishing for salmon in the Dominion of Canada, except under authority of leases or licenses from the Department of Marine Fisheries, is hereby prohibited," and it was there held that the prohibition of this statute did not extend to such riparian owners. In the State of Wisconsin a statute was passed prohibiting the cutting of ice from any meandered lake for shipment out of the State, except by those permitted to do so by a license issued by the

Secretary of State, and the Supreme Court, in the case of *Ross-miller* v. *State,* 89 N. W. 839, a prosecution for violation of this act, held that the title to the lakes and the waters thereof were in the State for the purpose of regulating the common use and enjoyment, yet the State had no such proprietary interest as implied the right to sell or grant special privileges for the use. The court, speaking through Mr. Justice Marshall, says: "Is ice formed naturally upon the public waters of the State State property in a proprietary sense—property which it can deal with as a private person deals with his property rights? * * * Obviously, there can be no difference between public water, in a liquid condition, and in the form of ice, or between water and the land covered thereby, or the fish or fowls which inhabit the same, or any of the animals *ferae naturae,* in respect to the sovereign authority over the same. If one may be dealt with as the absolute property of the State, the others may be." After an exhaustive review of the authorities the learned justice continues: "It seems clear that if the State can not sell the bed of a navigable lake, it can not sell the waters thereof; or the fish therein, or the fowls that resort to its surface, or the ice, that forms thereon. The rules that limit the rights as to one of those matters limit its power as to all. The foregoing seems not only to leave no reasonable, but no possible doubt, as to the conclusion which ought to be reached in this case. It stamps the act in question indelibly as a result of a misconception of the State's interest in navigable lakes, and as being baseless and unconstitutional. The title to the beds of such lakes is in the State, but not for its own use as an entity. The mere naked legal title rests in the State, but the whole beneficial use thereof, including the use of the ice formed thereon, is vested in the people of the State as a class." See also *Sanborn* v. *People's Ice Company,* 82 Minn. 43, s. c. 84 N. W. 641; *People's Ice Co.* v. *Davenport,* 149 Mass. 322, s. c. 14 Am. St. Rep. 425; *Rowell* v. *Doyle,* 131 Mass. 474; *Brown* v. *Cunningham,* 82 Iowa, 542; *Barrows* v. *McDermott,* 73 Me., 441; *Woodman* v. *Pitman,* 79 Me. 456; *Priewe* v. *Improvement Co.* 93 Wis. 534; *McLennan* v. *Prentice,* 85 Wis. 427; *Illinois Central R. Co.* v. *Illinois,* 146 U. S. 387.

We assume, therefore, as firmly established by authority, that the State's ownership of fish and game is not such a proprietary interest as will authorize a sale thereof, or the granting of

special interests therein, or license to enjoy, but is solely for the purposes of regulation and preservation for the common use, and is not inconsistent with a claim of individual or special ownership by the owner of the soil, if it be found that there can be any such individual or special ownership. We next inquire whether the owner of lands in the State has any title to or property rights in the fish or game thereon?

By the common law of England the owner of land had no absolute property in animals *ferae naturae,* while at liberty in the wild state, but had a qualified interest or property in such as were found, so long as they remained on his territory, and when killed or captured thereon they became his absolute property. Blackstone's treatment of this subject is not altogether clear, though he seems to have considered the complete ownership of game, in the strictest proprietary sense, to have been in the crown as a personal prerogative, even since Magna Charta. Yet he recognized the right or privilege of one to take game or fish on his own premises without restraint as a substantial and valuable one. 2 Blackst. Com. 418, 419.

Mr. Christian in his learned notes combats, with the approval of Mr. Justice Coleridge, the doctrine apparently laid down by Blackstone to the effect that the sole right to take game rests primarily with the king, and maintains that at common law every person, *ratione soli,* had a right to take game on his own land. 2 Blackst: Com., p. 418, note 8.

In *Blades* v. *Higgs,* 11 House of Lords Cases, p. 621, Lord Westbury says: "Property *ratione soli* is the common law right which every owner of land has to kill and take all such animals *ferae naturae* as may from time to time be found on his land, and as soon as this right is exercised the animal so killed or caught becomes the absolute property of the owner of the soil." And Lord Cransworth in the same case said: "Wild animals, while living, though they are, according to Lord Holt, the property of the owner of the soil on which they are living, are not his personal property, so as to be the subject of larceny. They partake, while living, of the quality of the soil, and are, as growing fruit was, considered as part of the realty."

In the *Falkland Islands Co.* v. *Reg.,* 10 Jur. (N. S.) p. 807, where there arose the question of the construction of the grant of land made by the crown without reservation except the right to re-enter for the purpose of making roads, canals, and other works of public utility, and the right to cut timber and take stone for keeping such works in repair, it was held that "the grant of land in fee, and the devise of the ten thousand acres for the term, conferred on the appellant the exclusive right of killing and taking game, beasts of the chase, and animals which are properly *ferae naturae,* which might at any time be upon the land during the time such land was granted."

Mr. Sergeant Stephens, after discussing the various distinctions in claims to this character of property, after being reduced to possession, by reason of the difference of place where the game was found or started and was killed, says: "These distinctions seem to show that in general the property is acquired by the seizure or occupancy, though that can not prevail against the better claim of him in whose ground the animal is both killed and started (and who therefore may be said to be entitled *ratione soli*), or of him who has already a qualified property in it *ratione privilegii.* 2 Steph. Com. 83.

The American cases not only generally treat the right of the owner of land to take game thereon as a property right inhering from the ownership of the soil, but recognize the establishment of that right at common law.

In *Venning* v. *Steadman,* 9 Can. S. C., *supra,* the learned Chief Justice, in discussing the right of government to prohibit salmon fishing except under license from the Department of Marines, says: "Such an absolute prohibition of the enjoyment of their property by riparian proprietors, or what might be still worse by granting a license to one proprietor and withholding it from another, thereby destroying the value of the property of the one and enchancing the value of the property of the other, would simply be. an arbitrary interference with the rights of property, pure and simple." Mr. Justice Strong, in this same case, speaking of the right of riparian landowners to fish in a stream, says: "Then nothing can be better settled than the proposition that no restraint upon the ordinary rights of property,

no derogation from the fullest enjoyment of these rights, can be imposed by the State, except in express words."

The same court held that the right of riparian proprietors upon streams above tide water (unnavigable waters), and whose titles were such as to give them, according to the common law principles, the ownership of the beds of the streams to the middle line, to fish therein within the limits of their own lands was a private and exclusive right of property, a proprietary right of the same character as that to herbage of trees growing on the land or the minerals or game to be found upon it. *Queen* v. *Robertson,* 6 Can. S. C. 52.

The right of private ownership in game, so far as recognized as such at all, is of two kinds, denominated as the right or interest *ratione soli* (meaning, as the term implies, a right by reason of and growing out of the ownership of the soil), and the right or interest held by grant from the owner of the soil, called profits *a pendre;* the latter being defined to be "a right to take something out of the soil of another—is a right of common, and also some minor rights, as a right to take drifted sand, or a liberty to fish, fowl, hunt and hawk." 1 Crabb, Real Prop. 125; Phear on Waters, 57. The latter right is not a mere easement, but is held to be a right in the soil. Black, Law Dict.; *Post* v. *Pearsall,* 22 Wend. 425; Wash. Easements, p. 7; *Pickering* v. *Noyes,* 4 Barn. & Cress, 639; *Waters* v. *Lilley,* 4 Pick. 145; *Webber* v. *Lee,* L. R. 9 Q B. D. 315; *Bingham* v. *Salene,* 15 Or. 208; s c. 3 Am. St. Rep. 152; *Tinicum Fishing Co.* v. *Carter,* 100 Am. Dec. 597.

In *Bingham* v. *Salene, supra,* a grant of the right to hunt and kill wild fowls upon lakes within the boundaries of the owner of the soil is held to be a right of profit in the soil, and not a mere revocable license.

*Payne* v. *Sheets,* 55 Atl. (Vt.) 656, which is an exceedingly well considered and instructive opinion, holds that one not the owner of the land, who has a right to shoot game, fish, etc., has not a mere easement, but an interest in the soil, within the meaning of the term "owner" used in a statute authorizing an action of trespass *quare clausum fregit* against one entering upon lands without permission of the owner or occupant for the

purpose of shooting. Mr. Justice Watson, who delivered the opinion of the court, clearly distinguished, with express approval, the former decision of that court in the case of *State* v. *Theriault,* 70 Vt. 617, wherein the constitutionality of a law regulating the right of the owner of land to fish on his own premises was upheld as a proper exercise of the police power, it having been stated in the former case that "fish are *ferae naturae,* and the common property of the public or the State." The learned justice says: "To state it otherwise, the general ownership is in the people in their united sovereignty, but when such animals go upon private grounds, then the qualified or special right of property in the owner of the soil attached by virtue of his exclusive right to hunt, kill or capture them while there; and this upon the principle that property which a person has a special right to acquire to the exclusion of others is private property."

The basis of the decision of the Supreme Court of the United States in *McCready* v. *Virginia,* 94 U. S. 391, upholding the power and right of the State of Virginia to prohibit non-residents from planting oysters in the soil covered by her tide waters, is the fact that the State owned the bed of all tide-waters or navigable streams within its jurisdiction. Chief Justice Waite, speaking for the court, says: "The right · which the people of the State thus acquire comes not from their citizenship alone, but from their citizenship and property combined. It is, in fact, a property right, and not a mere privilege or immunity of citizenship. See also *Sterling* v. *Jackson,* 69 Mich. 488; *Hall* v. *Alford,* 38 L. R. A. 205; *Cobb* v. *Davenport,* 32 N. J. L. 369; *Hickman* v. *Sweet,* (Cal.), 33 Pac. 1099.

It is insisted that these questions generally rise in suits between individuals involving only individual rights, and that the recognized right to take game on one's own land and to prevent others from so doing is merely a right to prevent a trespass on the land, and not a right of property growing out of the soil. But this is not a correct estimate of the force of these authorities, for the cases all hold that it is a right inhering in the soil, and not a mere right to prevent an invasion of the possession of the owner.

In *Sterling* v. *Jackson, supra,* the court says: "The defendant claims that he had the right to shoot the wild fowl from his boat, because, as the waters were navigable where he was, he had the right to be there; that, there being no property in wild fowl until captured, if he committed no trespass in being where he was, no action will lie against him for being there and shooting the wild duck. There is a plausibility in the position which, considered in the abstract, is quite forcible, and, if applied to waters where there is no private ownership of the soil thereunder, would be unanswerable. But, so far as the plaintiff is concerned, defendant had no right to be where he was, except for the purpose of pursuing the implied license held out to the public of navigating the waters over his land. So long as that license continued, he could navigate the water with his vessel, and do all things incidental to such navigation. He could seek the shelter of the bay in a storm, and cast an anchor therein; but he had no right to construct a 'hide,' nor to anchor his decoys for the purpose of attracting ducks within reach of his shotgun."

In *State* v. *Shannon,* 36 Ohio St. 423, the same doctrine is well illustrated, and the court therein says: "True, navigable streams in this State are declared to be public highways; but the right to use a public highway is not abridged by protecting the owner of the fee in the exclusive right of killing game therein."

So it is held that a license to shoot or fish for a term amounts to a demise of an incorporeal hereditament, and comes within the statute of frauds, and can only be granted by deed. Wood on Stat. Frauds, § 5.

We therefore conceive it to be settled by authority and by long recognition in the law that the owner of land has a right to take fish and wild game upon his own land, which inheres to him by reason of his ownership of the soil. It is a property right, as much as any other distinct right incident to his ownership of the soil. It is not, however, an unqualified and absolute right, but is bounded by this limitation, that it must always yield to the State's ownership and title, held for the purposes of regulation and preservation for the public use. These two ownerships or rights, that is to say, the general ownership of the State for

one purpose, and the qualified or limited ownership of the individual growing out of his ownership of the soil, are entirely consistent with each other, and in no wise conflict.

The transitory nature of the property renders the benefit so diffusive that all may join in the enjoyment thereof, and for that reason the sovereign holds as the representative of the public, so as to regulate and protect the common use. Still, the right of the landowner to hunt and fish on his own lands is to that extent a special property right, though subordinate to the other.

The cases of *Geer* v. *Conn.,* 161 U. S. 519, and *Organ* v. *State,* 56 Ark. 267, are pressed upon our attention with great force and earnestness by the learned counsel for the State, as conclusive of the case at bar. In both those cases the general doctrine of State ownership of wild game and fish is declared, but the language of the courts in those cases, when limited to the question under consideration, as must always be done when testing the soundness of a declared doctrine, is undoubtedly correct, and in no degree inconsistent with the views herein expressed. The cases were almost identical upon the facts, being criminal prosecutions for the unlawful exportation of game out of the State in violation of a statute prohibiting the same. We see no reason whatever in the opinion we now express for receding from the law declared by this court in *Organ* v. *State.* On the contrary, we adhere to it. The fullest latitude of power in the State to regulate and preserve the game for the common enjoyment is conceded, and no such private property right therein which we hold to exist can retard or obstruct the exercise of that undoubted power. But we have another and altogether different prohibited for the sole reason that they are nonresidents of the owners have a right to hunt and fish upon their lands which is a property right, they are entitled to equal protection in the enjoyment of that right with other landowners, or whether it be destroyed by a statute passed under the guise of a police regulation to preserve the fish and game, and the right of enjoyment prohibited for the sole reason that they are nonresidents of the State. It is not of the fact that appellee is excluded from enjoyment of the common right of the citizen to fish and hunt, because

of his nonresidence, that he may complain, but of the exclusion, by reason of his nonresidence, from such special right which he should enjoy in common with other landowners.

Does the curtailment of this right fall within the prohibition of the Fourteenth Amendment? A complete answer to the inquiry is made in the affirmative when the conclusion is reached that the right denied is a property right. Nonresident landowners may be called upon to share the public burdens, and property rights in some instances must yield to the public demands, but the burden must rest equally upon all, and no discrimination in that respect be made against the nonresidents as such. *Eldridge* v. *Trezevant,* 160 U. S. 452.

In so far as the statute under consideration prevents the same enjoyment by appellee of the property right afforded the more fortunate resident landowner, it is a denial of "equal protection of the law," within the meaning of the constitutional guaranty, and can not be enforced, and the taking away of this right because of his nonresidence is "without due process of law."

Affirmed.

HILL, C. J. (dissenting.) The act of April 24, 1903, and the agreed statement of facts, present broadly this question:

Has the State the power to make it unlawful for nonresident owners of real estate to shoot and hunt game and to fish on their own or the State's property at any season while permitting residents to shoot and hunt and fish on their own and the State's property during seasons not prohibited by general and special game laws, known as the "open season?"

This question must be answered in the affirmative, unless there is a property interest in fish and game found on, over or under the surface of the real estate owned by such nonresidents, for the manifest intention of the General Assembly, as evidenced by the fourth section of said act, and the object and purpose of the act as a whole, are to make unlawful hunting and fishing by nonresidents.

No exception is made in favor of nonresidents on their own land, and hence it must be concluded that the General Assembly intended to exclude nonresidents from the privilege, or property interest—as it may be construed—of hunting and fishing on their

own lands, while granting the right to residents, within certain seasons, of hunting and fishing on their own lands and the lands and waters of the State. To restrict the plain language· of the act to hunting and fishing on the public lands and waters would simply be judicial legislation. Therefore, the question must be met, has the State power to do this?

If the right to hunt and fish on one's own land is a property right inhering to the ownership of the soil, then this act is offensive to the clause in the Fourteenth Amendment to the Constitution of the United States, and the same clause in section 8, article II, Constitution of Arkansas, providing that no person shall be deprived of "life, liberty or property without due process of law."

This "due process of law" clause is the mudsill of· constitutional government. The rough barons of England wrote it, almost with their swords, in Magna Charta, in these words: "No freeman shall be taken, or imprisoned, or be disseized of his freehold, or liberties, or free customs, or be outlawed, or exiled, or any otherwise destroyed; nor will we pass upon him, nor condemn him, but by the lawful judgment of his peers, or by the law of the land." These principles have lost no force in their more concise statement in our bill of rights—State and Federal. Counsel for appellee eloquently say: "These few but pregnant lines, fortified as they are by the Federal Constitution, are all that stand between us and the abyss of despotism or the hell of anarchy."

Therefore a court must pause and carefully consider whether legislation under review seeks to undo the work done at Runnymede. The Supreme Court of the United States is the final arbiter on all questions involving rights asserted under the Constitution of the United States; and its decision on such questions, whether in form to be reviewed by it from this court or not, should be conclusive.

In the case of *Geer* v. *State of Connecticut,* 161 U. S. 519, every question here involved was considered and determined adversely to the contention of the appellee, as will be herein shown. The contest was over a statute of the State of Connecticut which provided (briefly speaking) an open and closed season

for hunting and killing game; and further that at no time should certain game be killed for the purpose of shipment beyond the State; and further made it unlawful to transport or have in possession for transportation beyond the State any such game killed at any season. Geer was arrested for violating this statute, and, under the agreed statement of facts upon which he was tried, it was found that he was in possession of game killed during the open season for the purpose of transportation without the State, and that the game was not unlawfully killed for the purpose of transportation beyond the State. The case is stronger on the facts to support the contention of the appellee than the one at bar, because it was only dead game which was in the hands of Geer to be transported beyond the State, and had not been killed for that purpose. Evidently, under the case made, after the game was lawfully killed, Geer came into possession of it for the purpose of shipping it without the State. Mr. Justice Field and Mr. Justice Harlan dissented from the opinion of the majority upon the ground that game, after being killed or captured, was then reduced to possession, and the taker or possessor had a property right in it which he would not have so long as it was uncaught.

The Connecticut court decided "that the State had power to make it an offense to have in possession, for the purpose of transportation beyond the State, birds which had been lawfully killed within the State during the open season, and that the statute, in creating this offense, did not violate the interstate commerce clause of the Constitution of the United States. The Federal Supreme Court said: "In other words, the sole issue which the case presents is, was it lawful under the Constitution of the United States (section 8, article I) for the State of Connecticut to allow the killing of birds within the State during a designated open season, to allow such birds, when so killed, to be used, to be sold, and to be bought for use within the State, and yet to forbid their transportation beyond the State? Or, to state it otherwise, had the State of Connecticut the power to regulate the killing of game within her borders so as to confine its use to the limits of the State, and forbid its transmission outside of the State?

It is true that in that case and the one at bar different clauses of the Federal Constitution were invoked against the validity of the statute; in that case the "interstate commerce clause," and in this the "due process of law." This was owing to the varying facts and terms of the statutes, but the solution of each of the questions depends solely upon whether there is property interest in game. If there is, then the Connecticut statute would fall because in restraint of an interstate shipment of property; in this case, because it takes the property right from the landowner without due process of law.

The Supreme Court of the United States considered the question as turning on whether there was a property right in game. Mr. Justice White, after stating the facts and issues presented, as above quoted, then said: "In considering this inquiry we of course accept the interpretation affixed to the State statute by the court of last resort of the State. The solution of the question involves a consideration of the nature of the property in game and the authority which the State had a right lawfully to exercise in relation thereto." Then the learned justice takes up the subject of the ownership of fish and game from the earliest times known to the laws of civilized countries. He traces it through the Grecian, Roman and Salic laws, and gives an extract from the Code Napoleon, which he says summed up an unbroken line of law and precedent, as follows: "There are things which belong to no one, and the use of which is common to all. Police regulations direct the manner in which they may be enjoyed. The faculty of hunting and fishing is also regulated by special laws." He further says that the fundamental principle on which property in game rests pervade the laws of Germany, Austria, Italy, and, indeed, all the countries of Europe. Then, passing to the common law of England, he says: "The common law of England also based property in game upon the principle of common ownership, and therefore treated it as subject to governmental authority." Then follow quotations from Blackstone showing the paramount authority of the government over fish and game, while recognizing a qualified property in the privilege of hunting and fishing on his own ground to the exclusion of others; but the minute the game passes his boundary, that fugitive right is also gone.

The court proceeds to declare that this attribute of the government to control animals *ferae naturae* was vested by inheritance in the colonies founded in America by the English people, and passed from the colonies to the several States on the formation of the Union, and remains in the States to the present day, in so far as its exercise may be not incompatible with, or restrained by, the rights granted the Federal government. Then. the court proceeds to a review of the numerous decisions of the Supreme Court of the United States and of the several States, recognizing the absolute right of the State to control and regulate the common property in game and fish. The court cites and approves many cases, not only of regulation, but of "control" of the common property in game. Among others so cited is *Organ* v. *State,* 56 Ark. 270, in which Mr. Justice Hemingway for this court said: "The ownership of fish is in the State for the benefit of its people in common, and the Legislature has the right to permit individuals to catch them upon such terms as it may impose, and to restrict the property acquired in them, when caught, to such extent as it seems proper. *McCready* v. *Virginia,* 94 U. S. 391.; *Am. Express Co.* v. *People,* 133 U. S. 649; *Magner* v. *People,* 97 Ill. 333." In the case of *Magner* v. *People,* cited with approval by Judge Hemingway, the Illinois court said: "No one has a property in the animals and fowls denominated 'game,' until they are reduced to possession. Whilst they are untamed and at large, the ownership is said to be in the sovereign authority—in Great Britain in the King, but with us in the people of the State. * * * The ownership being in the people of the State, the repository of the sovereign authority, and no individual having any property rights to be affected, it necessarily results that the Legislature, as the representative of the people of the State, may withhold or grant to individuals the right to hunt or kill game, or qualify or restrict it, as, in the opinion of its members, will best subserve the public welfare. Stated in other language, to hunt and kill game is a boon or privilege granted, either expressly or impliedly, by the sovereign authority—not a right inhering in each individual; and, consequently, nothing is taken away from the individual when he is denied the privilege at stated seasons of hunting and fishing. * * * But in any view the question of individual enjoyment is one of public policy,

and not of private right." This is reiterated and approved in *People* v. *Bridges*, 142 Ill. 30.

The above excerpt, and more, from *Magner* v. *People,* is quoted by Mr. Justice White in the Geer case as expressing the correct doctrine. Therefore the case comes as authority approved by this court and approved and copied at length as part of its opinion by the Supreme Court of the United States. Coming thus accredited, it is conclusive and binding authority to the effect that there is no property right in fish and game in individuals as against the State, and the State may, as a boon or privilege, permit hunting and fishing to any one, or withhold it from any one, and affect no property interest whatever.

Returning to the Organ case, Mr. Justice Hemingway continued: "It (referring to the State) may prohibit catching them entirely, or for a specified season; or it may permit them to be caught for the use of the person who makes the catch, and withhold the right to sell them, or ship them for sale. When preserved for the common benefit of the people of the State, they are not articles of commerce in any sense, and we can not see that they become such simply because the Legislature permits them to be caught by individuals for use within the State only." Counsel for appellee, to break the force of this decision as authority here, says of it that it "merely follows *Geer* v. *Conn.* The fish were taken from public waters, and the case has no resemblance to this." It would be more accurate to say that *Geer* v. *Conn.* followed the Organ case, as it is twice cited approvingly therein. But the argument of counsel is answered in the opinion itself wherein it says: "One who catches them had originally no separate property in them, and no right to acquire it except as the Legislature might provide; as all right of property in them is derived from the State, it is subject to such terms as the Legislature imposes. * * * The restriction was imposed by right of ownership, and not in the exercise of any assumed power to regulate the commercial use of private property." Thus the power of regulation is placed upon its only true basis—the right of ownership of the fish and game in the State, and it matters not where it is found (except reclaimed game in parks and fish in private ponds, which have a property right impressed in them

by being reduced to personal possession, and are no longer *ferae naturae.*)  But a more complete answer than is here given to the position of counsel that the Organ case does not control as to game or private property, but only in public domain, is given in *American Express Co.* v. *People*, 133 Ill. 649. This case is cited as authority by Mr. Justice Hemingway in the Organ case and by Mr. Justice White in the Geer case.  It grew out of a statute of Illinois prohibiting the exportation of quail killed anywhere in the State, whether on private or public domain, and the court said: "It is, however, argued that where quail have been killed, the dead animals become property, and the taker becomes the absolute owner of such property, and an act to prevent a sale or transportation for sale within the State would be an interference with private right, amounting to a destruction of the right of property without due process of law."  This is not distinguishable from the position of appellee herein who insists that the right to take game on his own property is a property right which can not be taken from him without being a destruction of the right of property without due process of law.  But the Illinois court answered this argument as follows: "The fallacy of the position consists in the supposition that the person who may kill game has an absolute property in the dead animals.  In the Magner case, *supra,* it was held, as has been seen, that no one has a property in animals and fowl denominated game—the ownership was in the people of the State.  * * *  The act, therefore, does not destroy a right of property, because no such right exists."

Mr. Justice White, after fully reviewing the adjudications of many States on this subject, deduces these propositions: That the qualified property interests in game is derived from the sovereign grant of it, and it may be withheld, restricted or regulated; that a State may permit its own people to enjoy their own property, and withhold from them the right to deal with it as an article of interstate commerce; that there may be an internal commerce in the dead animals which does not conflict with the right of Congress to regulate interstate commerce; and further: "The common ownership imparts the right to keep the property, if the sovereign so chooses, always within its jurisdiction for every purpose."

In speaking of cases from Kansas and Idaho contrary to the decision reached in Geer case, Justice White said: "But the reasoning which controlled the decision of these cases is, we think, inconclusive, from the fact that it did not consider the fundamental distinction between the qualified ownership in game and the perfect nature of ownership in other property, and thus overlooked the authority of the State over property in game killed within its confines, and the consequent power of the State to follow such property into whatever hands it might pass, with the conditions and restrictions deemed necessary for the public interest." This ultimate conclusion that decisions to the contrary of this one are based on a confusion of the nature of the qualified property right in game may account for some decisions conflicting with this view, but in the main there is no serious conflict in the decisions. Take for instance *Payne* v. *Sheets,* 55 Atl. 656, which appellee's counsel present as the best considered opinion dealing with the question of ownership of game. The action was trespass *quare clausum fregit* brought under a statute of Vermont giving such action to the owner or occupant of land against a person going thereon without permission of the owner or occupant for the purpose of hunting thereon. The plaintiff alleged that he was the owner and occupant of the land for the purpose of shooting, trapping, fishing, etc. He was not the owner of the fee, but of these hunting and fishing rights, and the question was presented whether he was an owner or occupant of the land within the statute. In an earlier Vermont case, *State* v. *Theriault,* 41 Atl. Rep. 1030, the court had held: "Fish themselves are *ferae naturae,* the common property of the public, or of the State in this country. From this common property, the owner of the soil over which the nonboatable stream flows has the right to appropriate such as he may capture and retain; but this right of capture and appropriation is subject to regulation and control by the representatives of the people, so that they shall continue to be common property. * * * Not a decision in this country, State or National, has been brought to our attention by the respondent, nor by quite an extensive examination of such cases, which holds that such acts of the State Legislature, in regard to this class of property, and in restraint of the right of the

S C  9

riparian owner to take and appropriate fish therefrom, are uncon-
stitutional. They have uniformly been held to be, not a taking
of private property or private rights for public use, for which
compensation must be made, but an exercise of the police power
of the State to preserve and increase a common property," etc.
The court in *Payne* v. *Sheets,* commenting on this decision, said:
"The sole question in *State* v. *Theriault* was, as considered, the
constitutionality of the law regulating the right of the owner
of land to fish on his own premises. The law was upheld as a
proper exercise of the police power, under the provisions of the
constitution." Thus this class of cases was approved, and held
not to be in conflict with the views entertained in the case then
before the court, which was a mere question between individuals
as to the rights permitted by the State. The court held that there
was a qualified ownership in the soil for the purpose of
hunting and fishing, separate from the ownership of the
land itself. This is technically known as a profit *a prendre.* It
is a well recognized and valuable right. As pointed out by
counsel for appellee, vast game preserves in the north of Eng-
land and Scotland are annually let to rich Americans and other
parties of means and leisure. These game preserves are not
unknown in this country, and in *Payne* v. *Sheets* the profit *a
prendre* was protected to the extent of holding the owner of it
an "owner or occupant" within the trespass statute of Vermont.
But this valuable incident to real estate is held subject to the
right of the sovereign authority. It is conceded on all sides that
the enjoyment of it may be restricted by regulations, like the
open and closed seasons. And it is thought that the authorities
here adduced establish that it may also be absolutely forbidden
by the sovereign, or granted as a boon or privilege to whom the
sovereign chooses. Therefore the qualified ownership in game,
the profit *a prendre* in land for purpose of hunting or fishing
thereon, is a valuable right between individuals. Trespassing
will not be allowed to destroy it or interfere with it, but it is sub-
ject to the dominance of the people who have the perfect, not
qualified, property interest therein.

The argument is also made that this act discriminates unlaw-
fully by denying equal privileges to citizens of other States.
*McCready* v. *Virginia,* 94 U. S. 391, puts this question at rest.

This same question came up in Tennessee under a statute forbidding fishing anywhere except by rod or line and excepting private ponds, and was thus disposed of by the Supreme Court of that State: "Finally, it is insisted that this act is void because violative of the first section of the Fourteenth Amendment of the Constitution of the United States in that it unwarrantably interferes with the property rights of owners of lakes, etc. We think this contention equally unsound. It overlooks the fact that fish in streams or bodies of water have always been classed by the common law as *ferae naturae,* in which the riparian proprietor, or the owner of the soil covered by the water, even though he may have the sole and exclusive right of fishing in said waters, has, at best, but a qualified property, which can be rendered absolute only by their actual capture, and which is wholly divested the moment the fish escape to other waters." *Peters* v. *State,* 96 Tenn. 682.

In the opinion of the minority of the court in this case the act is constitutional, and the fourth clause effective against nonresidents hunting and fishing in their own premises, and therefore the judgment should be reversed.

Mr. Justice BATTLE concurs herein.