## PAVEL et al. v. PATTISON, Dist. Atty., et al.

### No. 769.

District Court, W. D. Louisiana, Lake Charles Division.

Sept. 15, 1938.

T. A. Edwards, of Lake Charles, and D. C. Bland, of Orange, Tex., for complainants.

James O'Connor, First Asst. Atty. Gen., for respondents.

Before FOSTER, Circuit Judge, and DAWKINS and BORAH, District Judges.

DAWKINS, District Judge.

This is an action to enjoin the enforcement of a State statute in so far as it denies to the plaintiffs, non-residents of the State, the right to trap fur-bearing animals and alligators upon the lands owned by one of them in this State, until they have resided here for not less than one year.

It has been stipulated that the facts are correctly alleged in the bill of complaint. They are as follows:

Plaintiff, Pavel, was a citizen of Louisiana for more than forty years, but has resided in Orange County, Texas, since 1915. At the time of his departure from Cameron Parish, Louisiana, he owned 14,000 acres of marsh lands therein, which were only fit for trapping. Plaintiff, White, was a native-born citizen of Louisiana, owns no real property, and has for several years made his living trapping fur-bearing animals in this State. For the last six or seven years he has lived in camps and boat-houses in Cameron Parish, catching fur-bearing animals in winter and alligators in summer, and during part of each winter his wife and children have lived in Orange County, Texas, because they could not live in the marshes. Owning no lands, he has to acquire the right to trap from others.

On September 10, 1936, Pavel and White made an agreement, by which the former conveyed to the latter "all his right, title and interest in and to all the wild fur-bearing animals and alligators on, or to be found on, the lands described in said conveyance, for a period of two years, with the exclusive right of ingress and egress to take them", and for which Pavel was to receive one-fourth of all the pelts and hides taken. White took possession of the lands, obtained from the Sheriff of Cameron Parish a trapper's license for the season beginning November 20, 1936, and continued to trap until January 7, 1937, when he was arrested by a deputy sheriff of said Parish and an agent of the State Department of Conservation, and placed in prison. At the time of his arrest, he had in his possession trapper's licenses for the years 1935-1936 and 1936-1937. A bill of information was filed by the District Attorney for the State, charging White with violation of Section 5 of Act 80 of the Legislature of 1926, which reads as follows: "That only such persons as shall have resided continuously in this State for one year preceding the opening of the trapping season, shall be permitted to trap fur-bearing animals or alligators in this State, or shall be permitted to receive license therefor."

This charge was to have been tried in December following the filing of the petition in the present case on November 4, 1936, but was stayed by the granting of preliminary injunction by this court. White had been prevented from further trapping on the lands during the season of 1936-1937, which caused him a loss of $1,200 and $400 to Pavel. If White had not been permitted to trap during the 1937 and 1938 season, he would have suffered a further loss exceeding $3,000 and Pavel more than $1,000.

The grounds of attack upon the State statute, although inartistically stated, are, that it discriminates between the plaintiffs and citizens of the State, amounts to a denial of equal protection and takes their property without due process of law, contrary to the 14th Amendment to the Federal Constitution, U.S.C.A.Const. Amend. 14.

A rule to show cause why preliminary injunction should not be granted was issued and the matter was heard at New Orleans by a statutory court of three judges, Jud.Code § 266, 28 U.S.C.A. § 380.

The defendants are the District Attorney, who filed the bill of information, and the sheriff, who arrested White. They have filed exceptions to the jurisdiction and of no cause of action.

■ The plea to the jurisdiction is both in personam and rationæ materiae. Nothing is said in either brief about these exceptions. The agreed statement of facts admits, for the purposes of this proceeding, that White is also a non-resident, so that both he and Pavel are arranged on the same side since their contentions and demands for relief are identical. The defendants are the officers charged with the enforcement of the statute assailed, and it seems clear that there is the necessary diversity of citizenship to give a Federal court jurisdiction of the persons on that ground. As to the subject matter, according to the petition, the amount involved exceeds $3,000, and the stipulation admits this as true. The plea to the jurisdiction on both grounds will, therefore, be overruled.

The exception of no cause of action involves the same issues as the merits, and they will be disposed of together. The Act, No. 80 of 1926, is a general conservation measure, in which "all the non-game quadrupeds, or wild fur-bearing animals, and alligators," (section 2) are declared to be the property of the State, in whom the title remains until there has been paid to the State the taxes levied thereon by its provisions. It levies an annual license tax on those engaged in the business of trapping such animals, and prohibits everyone from doing

so until a license has been procured under criminal penalty. It also regulates the time and manner of trapping. In the first section terms used in the Act are defined and it says, "A 'trapper' shall be considered to be a person who takes the animal in its wild state and removes the skin therefrom for sale." Section 1.

█ It is well settled that the wild life, including animals, fish and fowl, is under the control of the State, which holds the title thereto in trust for all the people; that it may prohibit the taking, catching or killing of any or all of it; and that it may also, under proper conditions, confine these privileges to its own citizens. See Geer v. Connecticut, 161 U.S. 519, 16 S.Ct. 600, 40 L.Ed. 793; Foster-Fountain Packing Company v. Haydel, 278 U.S. 1, 11, 49 S.Ct. 1, 4, 73 L.Ed. 147; Lacoste v. Department of Conservation of Louisiana, 263 U.S. 545, 44 S.Ct. 186, 68 L.Ed. 437. In Lacoste v. Department of Conservation, supra, it was said [page 187]: "The wild animals within its borders are, so far as capable of ownership, owned by the state in its sovereign capacity for the common benefit of all of its people. Because of such ownership, and in the exercise of its police power the state may regulate and control the taking, subsequent use and property rights that may be acquired therein".

However, in the earlier case of Geer v. Connecticut, the same court, through Justice White,—afterwards Chief Justice,—explained the nature of this trust and ownership by the State, as follows [page 604]: "While the fundamental principles upon which the common property in game rests have undergone no change, the development of free institutions has led to the recognition of the fact that the power or control lodged in the state, resulting from this common ownership, is to be exercised, like all other powers of government, as a trust for the benefit of the people, and not as a prerogative for the advantage of the government as distinct from the people, or for the benefit of private individuals as distinguished from the public good. Therefore, for the purpose of exercising this power, the state, as held by this court in Martin v. Waddell, 16 Pet. [367], 410 [10 L.Ed. 997], represents its people, and the ownership is that of the people in their united sovereignty."

██ In dealing with its own citizens and those of other States, every State, of course, is governed by the Federal Constitu- tion, to which all have necessarily subscribed, in according to the people of the whole country equal protection of the law. From a political standpoint, it is entirely proper for the State to prescribe regulations of residence and qualifications to hold office or participate in elections; but the property of and its enjoyment by the nonresident is by that Constitution given protection equally with that of citizens of the State. We take cognizance of the extent to which the fur business has grown in Louisiana during the last twenty years, to the point where it is said to be second only to that of Alaska, and during some seasons more than six million pelts have been marketed. Prior to the development of this industry, marsh lands possessed little value and trapping was done without regard to ownership by persons who were more or less squatters, eking out a scant living in that way. However, within the past two decades the courts of the State have definitely settled the right of private ownership in these lands. The result is that a substantial industry, similar to those embracing shrimp and oysters, has developed, furnishing employment for hundreds of people. One who owns such lands necessarily has to employ trappers or lease them to others, and in return receives a portion of the catch, or money rentals, similar to methods applying to farm property. Recognizing this condition, the State, by its laws, has and does permit the taking and selling of the skins, subject to its police power and regulations of its Conservation Department. The question with which we are confronted, therefore, is, can the State, in view of its policy of exploitation, and the fact that it ultimately permits the passing of unconditional ownership into private hands, discriminate against the non-resident owner of lands and persons wishing to engage in the business of trapping, simply upon the ground of such non-residence?

It is alleged and admitted by the stipulation that the 14,000 acres of marsh lands have no value for agricultural, grazing or other purposes, except their unknown mineral possibilities, but that they do have great value in "furnishing feeding grounds and hiding places for wild fur-bearing animals and alligators." We can take cognizance that most of the non-game, fur-bearing animals and alligators possess little or no value as sources of food; that their own surroundings in the matter of food, protection from other predatory animals, poachers, etc., are improved and preserved by the

owners of such lands to encourage propagation and increase of catches, much as is done for domesticated animals. The situation in this respect is to that extent, at least, different from cases like Geer v. Connecticut, supra, wherein the hunting and capturing of game involved almost entirely matters of sport and food. Too, unlike those cases, where the game was required to be kept in the State for consumption of its people, the sole object of permitting the trapping of these fur-bearing animals is to obtain their hides or pelts which go into both interstate and foreign commerce. The owner acquires a property right as fully as if he had purchased a horse or cow from a citizen of the State.

The marsh lands are also private property, recognized and taxed as such and whose values are influenced by their fur-producing qualities. We thus have two principles of law to consider: First, the sovereign power of the State to control this common property, such as wild animals, fish, etc., and the other, the inhibition of the Federal Constitution against 'the deprivation of a property right, discrimination and denial of equal protection of the law to citizens of other States. It scarcely needs the citation of authority to say that a State could not declare that only lands belonging to its own citizens could be trapped, in view of the extent to which it has been permitted and encouraged in this State. A somewhat analogous situation was presented in the case of Foster-Fountain Packing Company v. Haydel, supra, but involving the commerce clause of the Federal Constitution, rather than the due process and equal protection clauses of the 14th Amendment, U.S.C.A.Const. There the shrimp industry was involved and the State sought to restrict canning within its own limits under the subterfuge of requiring the heads and shells to be removed before the meat could be shipped out of the State. The court took notice of the fact that the law was not intended and did not restrict or confine the use and consumption of shrimp to the citizens of Louisiana, but permitted it to become an object of commerce, just as the statute now in question does the pelts of fur-bearing animals and alligator hides. In disposing of the matter, it was said [page 4]:

"But the case is essentially unlike this one. The purpose of the Louisiana enactment differs radically from the Connecticut law there upheld. It authorizes the shrimp meat and bran, canned and manufactured within the state, freely to be shipped and sold in interstate commerce. The state does not require any part of, the shrimp to be retained for consumption or use therein. Indeed only a small part is consumed or needed within the state. Consistently with the act all may be, and in fact nearly all is, caught for transportation and sale in interstate commerce. As to such shrimp the protection of the commerce clause attaches at the time of the taking. Dahnke-Walker Milling Co. v. Bondurant, supra [257 U.S. 282, 42 S.Ct. 106, 66 L.Ed. 239]; Pennsylvania v. West Virginia, supra, 262 U.S. 553, 596 et seq., 43 S.Ct. 658, 67 L.Ed. 1117, 32 A.L.R. 300. As the representative of its people, the state might have retained the shrimp for consumption and use therein. But, in direct opposition to conservation for intrastate use, this enactment permits all parts of the shrimp to be shipped and sold outside the state. The purpose is not to retain the shrimp for the use of the people of Louisiana; it is to favor the canning of the meat and the manufacture of bran in Louisiana by withholding raw or unshelled shrimp from the Biloxi plants. But by permitting its shrimp to be taken and all the products thereof to be shipped and sold in interstate commerce, the state necessarily releases its hold and, as to the shrimp so taken, definitely terminates its control. Clearly such authorization and the taking in pursuance thereof put an end to the trusts upon which the state is deemed to own or control the shrimp for the benefit of its people. And those taking the shrimp under the authority of the act necessarily thereby become entitled to the rights of private ownership and the protection of the commerce clause. They are not bound to comply with, or estopped from objecting to the enforcement of, conditions that conflict with the Constitution of the United States. Quaker City Cab Co. v. Pennsylvania, 277 U.S. 389, 48 S.Ct. 553, 72 L.Ed. 927; Power Mfg. Co. v. Saunders, 274 U.S. 490, 493, 497, 47 S.Ct. 678, 71 L.Ed. 1165; Hanover Fire Insurance Company v. Harding, 272 U.S. 494, 507, 47 S.Ct. 179, 71 L.Ed. 372, 49 A.L.R. 713.

If the State, under the circumstances disclosed in the present case, can prevent the non-resident owner of land from exercising the right to trap it on equal terms with citizens of the State, by denying to him a license or permit except on the con-

dition of his becoming a resident of the State for one year, then it could make the term ten or twenty years, just as well, and which would be, for all practical purposes, to deny it altogether.

Nothing has been said in the argument or the brief of the defendants, of a plausible nature, justifying the requirement of twelve months' residence, except "The only restriction is against nonresidents, who are neither directly nor indirectly tax payers, and who do not share in the maintaining of the State Department for conserving and protecting the wild game, which is owned by the people of Louisiana and held in trust for them by the State, which regulates the hunting and trapping of such wild game for the benefit of the owners of the wild game, the people of Louisiana."

We know, as a practical proposition, that the actual trappers of these furs, during the trapping season, occupy small shanties or house-boats and possess little or no property other than their trapping paraphernalia upon which taxes could be laid; whereas, the non-resident land-owner's property is within the State's jurisdiction and subject to taxation, like all the rest, and there is nothing to prevent the State from making him and his property responsible for any damage or loss of taxes, etc., by the exercise of trapping rights upon his lands.

It is our conclusion that, as stated in Foster-Fountain Packing Company v. Haydel, supra, the rights of the landowner and his lessees or assignees are to be determined by the nature, extent and purpose of the legislation, which contemplates from its inception the ultimate complete release of control over the furs, their passage into absolute private ownership, and dealing therein in a recognized industry of both national and international scope. In this view, the protection of the 14th Amendment, U.S.C.A.Const., like that of the commerce clause in the decided case, "attaches at the time of the taking." See R.C.L., Vol. 12, p. 695, verbo, Game Laws; State v. Mallory, 73 Ark. 236, 83 S.W. 955, 67 L.R.A. 773, 3 Ann.Cas. 852. The plaintiff Pavel is entitled to deal with his property on an equal footing with other landowners residing in the State, complying with the law as to license taxes, etc., and the defendants should be enjoined from arresting, prosecuting or otherwise interfering with the exercise of those rights, under provisions of Section 5 of the Act assailed.